FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2018 AUG 31   PM 1:43

CLERK _____
SO. DIST. OF GA.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

DEMARCUS WHITAKER,   )
)
    Plaintiff,   )
)
v.   )
)
THE BOARD OF REGENTS OF THE   )
UNIVERSITY SYSTEM OF GEORGIA,   )
BROOKS KEEL, *President of Augusta*   )
*University, sued in his official and personal*   )
*capacities,*   )
JAMES RUSH, *Chief Integrity Officer*   )
*of Augusta University, sued in his*   )
*official and personal capacities,*   )
MICHELE REED, *Title IX coordinator*   )
*of Augusta University, sued in her*   )
*official and personal capacities,*   )
GINA THURMAN, *Assistant Dean of*   )
*Student Life & Enrollment, sued in her*   )
*official and personal capacities,*   )
QUINCY BYRDSONG, *Vice President of*   )
*Academic Planning & Strategic Initiative,*   )
*Office of Diversity and Inclusion, Chief*   )
*Diversity Officer, sued in his official and*   )
*personal capacities,*   )
DONNA WEAR, *Professor of Biology at*   )
*Augusta University, sued in her official and*   )
*personal capacities,*   )
ROBERT BOEHMER, *President of East*   )
*Georgia State College, sued in his official*   )
*and personal capacities; and*   )
TRACY WOODS, *Director of Human*   )
*Resources/Career Services, Title IX*   )
*coordinator of East Georgia State College,*   )
*sued in her official and personal capacities,*   )
)

    Defendants.

CIVIL ACTION

FILE NO. **CV 1 1 8 - 0 1 4 1**


**COMPLAINT**


**JURY DEMAND**

1

**TABLE OF CONTENTS**                                           **Page**

I. THE NATURE OF THIS ACTION.......................................................   5

II. JURISDICTION AND VENUE.........................................................   15

III. THE PARTIES.............................................................................   18

IV. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS..............   22

      Mr. Whitaker and Jane Roe Both Receive a Copy of the
      No-Contact Order.................................................................   24

      Jane Roe speaks to Mr. Whitaker Three Times after the
      No-Contact Order and the investigator refuses to charge
      her......................................................................................   27

      Mr. Whitaker Offered the Names of Five Students to be
      Interviewed by Defendant Thurman, but She Only
      Interviewed One..................................................................   31

      Mr. Whitaker Cited that the Retaliation started after he
      Reported the Professor Failing to Change the Lab
      Groups to Defendant Thurman.............................................   32

      Defendant Thurman Exposed Mr. Whitaker's Email
      for the Professor to See........................................................   34

      Defendant Thurman Instructed Mr. Whitaker to
      Provide her with Medical Documentation to be
      Withdrawn from the Class without Penalty..........................   35

      Mr. Whitaker filed a Challenge for Bias against All
      Involved in Attempting to Have Him Obtain
      Medical Documentation.......................................................   38

      Defendant Thurman Sent her Report on December 19,
      2016 Backdated to November 28, 2016................................   38

**TABLE OF CONTENTS (Cont.)**                                    **Page**

Defendant Thurman Included Information in her
Report that she Stated she Could not Include...............................   40

Defendant Thurman did not Include a Rationale
in her Report for Charging Mr. Whitaker with Sexual
Harassment....................................................................   45

Sanctions Defendant Thurman Sought to Impose
on Mr. Whitaker...............................................................   45

Defendant Reed Used the Backdated Report to Tell
Mr. Whitaker that it was too Late to File a Challenge
for Bias......................................................................   46

Defendant Reed's Cell Phone Went Missing with
No Explanation................................................................   48

Defendant Reed and Defendant Thurman Changed
Their Reasons for Charging Mr. Whitaker Three
Times.........................................................................   50

A Bias Investigation is Initiated against Defendant
Thurman and Defendant Reed...................................................   52

Mr. Whitaker Received Incomplete Bias
Investigative Results.........................................................   52

The Bias Investigation is Called into Question
Based on the Partnership Between Augusta
University and East Georgia State College....................................   54

Mr. Whitaker Reported False Statements Given
at the Hearing by Jane Roe, Defendant Thurman,
and Defendant Reed that went Uninvestigated..................................   55

The Hearing Panel Found Mr. Whitaker 'Not
Responsible.'.................................................................   60

**TABLE OF CONTENTS (Cont.)**                                    **Page**

The Chief Auditor Refused to Audit the Title IX
Department.................................................................... 60

Mr. Whitaker's Counterclaim Goes Uninvestigated......................... 61

Defendant Rush Dismissed Mr. Whitaker's
Counterclaim without a Hearing or Investigation............................ 63

The Board of Regents of the University System of
Georgia's 'Discretionary Review' Final Decision........................... 65

Mr. Whitaker Reported Six Conflicts of Interest
throughout the Investigation..................................................... 66

Title IX Training Records for Augusta University
Unaccounted for and No Budget Assigned for
Investigations....................................................................... 67

Mr. Whitaker Reported Three FERPA Violations
by Defendant Thurman and Defendant Rush............................... 69

Open Record Requests Submitted by Mr. Whitaker........................ 69

Damages............................................................................. 69

V. CAUSES OF ACTION............................................................ 70

VI. PRAYER FOR RELIEF.......................................................... 104

VII. CERTIFICATION AND CLOSING........................................... 111

## COMPLAINT

Plaintiff DeMarcus Whitaker (hereinafter referred to as "Plaintiff" or "Mr. Whitaker"), as and for his Complaint, respectfully alleges as follows:

## I. THE NATURE OF THIS ACTION

1.      This case arises out of the actions taken and procedures employed by Defendants Board of Regents ("Defendant Board of Regents"), President Brooks Keel ("Defendant Keel"), James Rush ("Defendant Rush"), Michele Reed ("Defendant Reed"), Gina Thurman ("Defendant Thurman"), Quincy Byrdsong ("Defendant Byrdsong"), Donna Wear ("Defendant Wear"), President Robert Boehmer ("Defendant Boehmer"), and Tracy Woods ("Defendant Woods"), concerning acts of retaliation, fraud, negligence, conflicts of interest, deceptive trade practices, malicious prosecution, defamation, deliberate indifference to gender-based discrimination under Title IX, and breach of contract for violations of University policy, including incomplete guidance regarding due process rights of the accused during the administrative disciplinary proceedings.

2.      Title IX officials at Augusta University attempted to have Mr. Whitaker obtain medical documents from a military medical installation and told him what to include in a written statement, in order to give to the investigator of his case

(Defendant Thurman); who disclosed that she served on the committee that reviews applications for medical withdrawals from the institution.[1]

3.   The plan was a tradeoff for not reporting the investigator for retaliation, the professor (Defendant Wear) for negligence, and Jane Roe for violating the no-contact order.[2]

4.   Mr. Whitaker refused to obtain and submit the medical paperwork and stated he would report them for employee misconduct for telling him what to say.

5.   Defendant Reed and Defendant Thurman pressed a charge of sexual harassment against Mr. Whitaker that was later thrown out by the University hearing panel due to no evidence.

6.   The initial retaliation started with the investigator intimidating and exposing Mr. Whitaker's emails for his professor to see after ending his interview when he reported the professor for not changing the lab groups after she had been directed to by the Title IX coordinator; selectively enforcing the no-contact order by refusing to charge Jane Roe for violating it after Jane Roe admitted to the acts and the professor admitted to witnessing the acts; and the not considering information that Mr. Whitaker offered concerning Jane Roe continuing to contact

---

[1] See *infra* ¶¶ 143-144.
[2] Plaintiff refers to Jane Roe pseudonymously.

him after she had claimed that he harassed her and not interviewing all of his witnesses.

7.     This medical withdrawal would have removed Mr. Whitaker from the class without penalty, as withdrawing after midterm would have resulted in a failing grade in the course.

8.     Mr. Whitaker filed an academic grievance for the professor's negligence, deliberate indifference, and selective enforcement of the no-contact order; of which he received a failing grade after ceasing to attend the class due to the hostile environment.

9.     The investigator, as well as the Title IX officials at Augusta University, charged Mr. Whitaker with an unfounded allegation of sexual harassment that was not supported with a rationale, backdated reports, omitted information that he offered from their reports, questioned one of his five witnesses, changed their reasons for charging him, gave false and misleading statements while under oath against him, refused to abide by the investigative procedures outlined in the handbook, included and factored in a prior 'previous complaint' made against Mr. Whitaker without his consent (as required in the handbook) in which he was never charged or found responsible, attempted to obstruct his challenge for bias against them, and provided misleading information to staff who considered his academic grievance.

7

10.   The investigator (Defendant Thurman) also served as the supervisor of the 'Student Counseling and Psychological Services' department; of which Jane Roe stated that she received counseling from Augusta University.

11.   The Title IX coordinator (Defendant Reed) sent a copy of the no-contact order to the wrong biology professor, which outlined the details of how the two students were to be separated and that no communication was allowed.

12.   Defendant Reed stated that she verbally conveyed the nature of the no-contact order to the professor despite her not receiving a copy of it; in which the no-contact letter reads that the professor will receive a copy.

13.   Defendant Reed stated that she lost the cell phone that she had present during meetings with Mr. Whitaker and corresponded with about sending up names of students who had knowledge of Defendant Wear not changing the lab groups.

14.   During the hearing, Defendant Reed stated that the text messages between herself and Mr. Whitaker were not about sending the names of students who could attest that the groups had not been changed by the professor.

15.   Defendant Reed stated that the police were tracking down her cell phone and said, "I have no idea," when questioned by Mr. Whitaker as to what happened to it.[3]

---

[3] See *infra* ¶ 181.

16.     Defendant Reed and Defendant Rush told Mr. Whitaker that they did not record any interviews and were advised against recording when Mr. Whitaker asked about documentation of his previous interviews with them.

17.     The handbook states, "the investigator should retain written notes and/or obtain written or recorded statements from each interview."

18.     Defendant Reed could not provide Mr. Whitaker with clear grounds for why Defendant Thurman found him responsible for sexual harassment when Mr. Whitaker asked her.

19.     Defendant Reed told Mr. Whitaker that not responding to Defendant Thurman's report meant that she would go by what was written in the report against him.

20.     The handbook states, "If respondent has not otherwise responded, a non-written response will be considered a general denial of the alleged misconduct."

21.     Defendant Reed and Defendant Thurman changed the reasons for why Mr. Whitaker was charged after Jane Roe could not obtain the text message correspondence between them alleging that she informed him to cease communicating with her; Defendant Reed stated that Mr. Whitaker was charged because of his "identifying behavior, words, and actions" when questioned at the

hearing by the Chairman and stated "no," when questioned as to whether she considered that 'profiling.'[4]

22.     Jane Roe never informed Mr. Whitaker to cease texting her and initiated texts for him to come study with her in the evenings in which he declined twice; two days later, Jane Roe filed a claim of sexual harassment and non-consensual touching against Mr. Whitaker.

23.     Mr. Whitaker filed a challenge for bias against Defendant Reed and Defendant Thurman which was investigated by Defendant Woods, the Title IX coordinator/Human Resources director at East Georgia State College.

24.     Defendant Thurman backdated and altered her investigative report after the challenge for bias was made against her without Mr. Whitaker's consent or foreknowledge.

25.     Defendant Woods returned a finding of no bias existing in either the investigator or coordinator without including a basis for her decision or a critical analysis of the facts presented by Mr. Whitaker.

26.     Mr. Whitaker requested a more thorough explanation of how Defendant Woods reached her findings and she wrote back that she would be

---

[4] See *infra* ¶¶ 183-186.

sending him the information he requested, as well as the officials at Augusta University promising that he would receive that information.[5]

27.     Defendant Woods never sent the information that she, and the University, promised Mr. Whitaker would receive on how she reached her decision.

28.     Regarding the bias review and investigation, Mr. Whitaker reported a conflict of interest existing between Augusta University and East Georgia State College that compromised the process in that the two universities formed a partnership in August of 2013 that allows for the mutual sharing of financial assets and resources.

29.     Augusta University officials acknowledged the partnership and stated that Defendant Woods was selected because it was 'the most convenient for the University.'

30.     Defendant Reed and Defendant Thurman made statements that favored the female complainant above him and presented information during the hearing that Mr. Whitaker did not know was going to be said against him.

31.     Defendant Wear exposed Defendant Reed, Defendant Thurman, and Jane Roe's false statements when cross-examined at the hearing; in which the three parties attempted to state that Jane Roe requested for the lab groups to be changed,

---

[5] See *infra* ¶¶ 191-192.

when Mr. Whitaker was the one that requested the 'interim measure' on the day of finding out about the allegation.[6]

32.    The University hearing panel did not uphold the charge of sexual harassment against Mr. Whitaker due to no evidence being presented to merit the charge against him.[7]

33.    The hearing panel neglected to address the issue of false and inconsistent statements presented by Jane Roe, Defendant Thurman, and Defendant Reed given under oath.

34.    The handbook states, "Any person found to have intentionally submitted false complaints, accusations, or statements, including during a hearing, in violation of this policy shall be subject to disciplinary action."

35.    After the hearing panel found Mr. Whitaker 'Not Responsible,' the investigator who charged the Plaintiff, Defendant Thurman, relinquished her duties as a volunteer Title IX investigator after working in the area for six years.

36.    Mr. Whitaker submitted a counterclaim against Jane Roe for violating the no-contact order during class which the Title IX office acknowledged Jane Roe did violate, yet dismissed his claim without investigating it after he had submitted evidence to them.

---

[6] See *infra* ¶ 214.
[7] See *infra* ¶ 215.

37.    Jane Roe also received the no-contact order that states, "Failure to comply with this request may result in action by Augusta University through the Sexual Misconduct Policy."

38.    Defendant Byrdsong was assigned to investigate Mr. Whitaker's counterclaim and left the University without informing Mr. Whitaker that he had abandoned his complaint.

39.    Jane Roe was allowed to graduate after making false statements during the hearing, violating the no-contact order, and admitting to academic dishonesty.

40.    The head of the Title IX office (Defendant Rush) stated that Jane Roe did violate the no-contact order, yet did not pursue disciplining her for it, denied Mr. Whitaker a hearing (in the handbook), and gave false information regarding pursuing any charges against her during follow-up meetings; that she was out of the University's jurisdiction because she had graduated, yet the handbook says otherwise.

41.    Defendant Rush did not inform Mr. Whitaker that he had taken authority over investigating his complaint.

42.    Defendant Rush is not a Title-IX investigator, but serves as a lawyer for the University.

43. Defendant Rush stated that he was a 'Title IX designee,' which changed to a 'Title IX coordinator' for Mr. Whitaker's counterclaim due to his claims of bias against Defendant Reed and Defendant Thurman; however, Defendant Reed is the only recognized Title IX coordinator at Augusta University by the Board of Regents of the University System of Georgia.

44. Defendant Rush ended Mr. Whitaker's counterclaim by sending a back-dated letter that stated there was 'insufficient information.'

45. Defendant Rush was not able to produce the documents that Mr. Whitaker submitted to Defendant Byrdsong that included admissions acknowledging the violation of the no-contact order by Jane Roe and the professor and correspondence by Defendant Reed promising Mr. Whitaker that she would follow up with Jane Roe to ensure there's no-contact.

46. Defendant Rush stated that the professor (Defendant Wear) was concerned about her safety and that he may have been 'driving by her house.'

47. Defendant Wear did not state any apprehension towards Mr. Whitaker during the hearing, of which Mr. Whitaker called and questioned her as a witness.

48. Defendant Rush stated the allegation during a meeting with Mr. Whitaker after refusing to answer questions concerning the dismissal of his counterclaim and telling him, "If you're gonna sue us, sue us," "I don't think your divorce has anything, necessarily, to do with this case," "Okay, get real. Really?

Please, do me a favor, get real. Um, if you have fifty questions you wanna ask me, do me a favor--, and we're gonna end this meeting now because I get to do that," "It's the biggest issue for you, right now, in your life. It's not necessarily my biggest issue, right now," and telling him, "Whatever rights you have, please go forward. Godspeed. Do it."

49.     Throughout the investigative process, Defendants failed to abide by Augusta University's and the Board of Regents of the University System of Georgia's own guidelines and regulations and acted in direct violation of federal and/or state law.

50.     Mr. Whitaker requested Title IX training records of the personnel involved in his investigation and only received information from Defendant Woods from East Georgia State College; Augusta University stated they did not retain training records on their personnel.

51.     Due to the deliberate indifference of University officials to the gender-based peer harassment of Jane Roe repeatedly violating the no-contact order and refusing to effectively address the issue, Mr. Whitaker was deprived of educational opportunities by having to drop out of the class in which he attended with Jane Roe due to anxiety leading to back spasms, divorced from his wife due to the false allegations on March 14, 2017, and ceased attending the University due to retaliation.

52.    Plaintiff therefore brings this action to obtain relief based on causes of action for violations of Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, violation of procedural and substantive due process rights, conflicts of interest, breach of contract, conspiracy against rights, retaliation, fraud, defamation, and other state law causes of action.

## II. JURISDICTION AND VENUE

53.    The Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §1367 because (i) Mr. Whitaker's claims arise under the United States Constitution, brought pursuant to 42 U.S.C. § 1981, 42 U.S.C. § 1983, and under the laws of the United States, including Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, and 42 U.S.C. § 1985 and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

54.    This Court has personal jurisdiction over Defendant Board of Regents on the grounds that it is conducting business within the State of Georgia and is the governing body of Augusta University and East Georgia State College.

55.   This Court has personal jurisdiction over Defendant Keel on the grounds that he was acting as an agent of Augusta University at all relevant times herein.

56.   This Court has personal jurisdiction over Defendant Rush on the grounds that he was acting as an agent of Augusta University at all relevant times herein.

57.   This Court has personal jurisdiction over Defendant Reed on the grounds that she was acting as an agent of Augusta University at all relevant times herein.

58.   This Court has personal jurisdiction over Defendant Thurman on the grounds that she was acting as an agent of Augusta University at all relevant times herein.

59.   This Court has personal jurisdiction over Defendant Byrdsong on the grounds that he was acting as an agent of Augusta University at all relevant times herein.

60.   This Court has personal jurisdiction over Defendant Wear on the grounds that she was acting as an agent of Augusta University at all relevant times herein.

61.    This Court has personal jurisdiction over Defendant Boehmer on the grounds that he was acting as an agent of East Georgia State College at all relevant times herein.

62.    This Court has personal jurisdiction over Defendant Woods on the grounds that she was acting as an agent of East Georgia State College at all relevant times herein.

63.    The Court is authorized to award the requested declaratory relief under the Administrative Procedure Act and the Declaratory Judgment Act, 5 U.S.C. § 706, 28 U.S.C. §§ 2201-2202, and is authorized to award the requested injunctive relief under 28 U.S.C. § 1361 and the Federal Rules of Civil Procedure 57 and 65.

64.    Venue properly lies in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred within this district.

## III. THE PARTIES

65.    Plaintiff DeMarcus Whitaker is an African-American, and at all times relevant to this Complaint, has been a citizen of the State of Georgia and served in the U.S. Army Reserve.  From January 4, 2016, to December 15, 2016, Mr.

18

Whitaker was an undergraduate student at Augusta University.  Mr. Whitaker

resides at 1008 Fox Den Rd, Hephzibah, GA 30815 and can be contacted at

dwhitaker279@gmail.com / Telephone: (706) 877 – 0482.

66.     Defendant Board of Regents of the University System of Georgia (the

"Board of Regents") oversees the 30 colleges and universities, including Augusta

University and East Georgia State College, that comprise the University System of

Georgia.  Pursuant to Georgia law, the Board of Regents is the legal entity that

must sue, or can be sued, in the place of Augusta University and East Georgia State

College.  Accordingly, the Board of Regents is the legal entity responsible for any

acts or omissions by Augusta University.  The Board of Regents can be contacted

at Board of Regents of the University System of Georgia, Vice Chancellor of Legal

Affairs, Edward Tate, 270 Washington Street, SW, Atlanta, GA 30334 (usg-

legal@usg.edu / Telephone: (404) 962 – 3255)

67.     Augusta University and East Georgia State College are recipients of

federal funding.

68.     Defendant Keel is the president of Augusta University and has the

responsibility of overseeing the overall functioning of the university.  His office is

located in Augusta, Georgia, and, upon information and belief, he resides in the

Southern District of Georgia.  (president@augusta.edu / Telephone: (706) 721 –

2301)

69.     Defendant Rush has the title of Chief Integrity Officer at Augusta University and works in the Office of Compliance and Enterprise Risk Management.  Defendant Rush's responsibilities include overseeing policies and procedures, HIPPA, external audits, as well as the Title IX office.  His office is located in Augusta, Georgia, and, upon information and belief, he resides in the Southern District of Georgia.  (jrush@augusta.edu / Telephone: (706) 721 – 1626)

70.     Defendant Thurman is the Assistant Dean of Student Life & Enrollment, Student Counseling and Psychological Services Supervisor, Office of Testing and Disability Services Supervisor, Campus Assessment Response and Evaluation Team Chairperson, Deputy Title IX coordinator, Title IX investigator. Upon information and belief, Defendant Thurman became the Title IX coordinator at Augusta University in 2011 and a Title IX investigator in 2016, when Defendant Reed was hired.  Her office is located in Augusta, Georgia and, upon information and belief, she resides in the Southern District of Georgia.  (gthurman@augusta.edu / Telephone: (706) 737 – 1411)

71.     Defendant Reed is the Title IX coordinator for students at Augusta University.  She works in the Office of Compliance and Enterprise Risk Management under Defendant Rush.  Her office is located in Augusta, Georgia and, upon information and belief, she resides in the Southern District of Georgia. (micreed@augusta.edu / Telephone: (706) 721 – 0901)

72.     Defendant Byrdsong is the Vice President of Academic Planning & Strategic Initiative, Office of Diversity and Inclusion, and Chief Diversity Officer. Defendant Byrdsong was assigned as the Title IX investigator to investigate Mr. Whitaker's claims of harassment. His office is located in Augusta, Georgia and, upon information and belief, he resides in the Southern District of Georgia. (qbyrdsong@augusta.edu / Telephone: (706) 721 – 9272)

73.     Defendant Wear is a professor of biology at Augusta University. Defendant Wear witnessed the violations of the no-contact order by Jane Roe. Her office is located in Augusta, Georgia and, upon information and belief, she resides in the Southern District of Georgia. (dwear@augusta.edu / Telephone: (706) 667 – 4168)

74.     Defendant Boehmer is the president of East Georgia State College and has the responsibility of overseeing the overall functioning of the university. His office is located in Swainsboro, Georgia, and, upon information and belief, he resides in the Southern District of Georgia. (president@ega.edu / (478) 289 – 2027)

75.     Defendant Woods is the Human Resources Director and Title IX coordinator at East Georgia State College. Defendant Woods was assigned to review Mr. Whitaker's claims of bias against Defendant Reed and Defendant Thurman. Her office is located in Swainsboro, Georgia and, upon information and

belief, she resides in the Southern District of Georgia. (twoods@ega.edu /

Telephone: (478) 289 – 2035)

## IV. <u>FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS</u>

76.     Mr. Whitaker re-enrolled at Augusta University in January of 2016

seeking his undergraduate degree in Biology before applying for the Physician

Assistant program after being away for five years and serving on active duty in the

U.S. Army.

77.     Mr. Whitaker and Jane Roe shared the same biology class in Fall 2016

under professor Dr. Wear (Defendant Wear), in which lecture was held on

Mondays and Wednesdays at 1:00 pm - 2:15 pm and the one lab during the week

was held on Tuesdays at 1:00 pm - 2:50 pm.

78.     Jane Roe chose to sit next to Mr. Whitaker on the first day of biology

lab for the Fall 2016 semester on August 23, 2016 and was their first time ever

meeting each other.

79.     Defendant Wear assigned locker combinations to all students

including Mr. Whitaker and Jane Roe on the day of August 23, 2016.

80.     Mr. Whitaker, Jane Roe, and the other two male lab members

exchanged contact information for the purpose of studying; of which this was Jane

Roe's second time taking the course.

81.    On September 15, 2016 and September 18, 2016, Jane Roe sent the

other two lab members two texts within the group praising Mr. Whitaker's ability

to explain a concept after studying in the cafeteria:

> "Marcus explained it to me. Ask him. To explain it to you. I understand it
> now." 5:02 PM, MMS +**********2, 09/15/2016 Thu
>
> "Tbh I'm not sure Marcus might be able to answer." 11:07 PM MMS
> +**********2, 09/18/2016 Sun

82.    Jane Roe alleged that Mr. Whitaker sexually harassed her on

September 15, 2016 while studying in the cafeteria around 3:00 pm; yet, the first

message praising Mr. Whitaker was sent two hours after she alleged that he

harassed and touched her and the second message was sent three days later.

83.    Mr. Whitaker made this inconsistency known to Defendant Thurman

and Defendant Reed, yet the information was omitted from Defendant Thurman's

investigative reports.

84.    Defendant Thurman admitted in an email to Mr. Whitaker on January

17, 2017 that she did omit information from her reports:

> "I did omit summaries of some of my meetings with both you and the
> Complainant. I have added that information now."
> (emphasis added.)

85.    During the hearing on May 8, 2017, Defendant Thurman stated, under

oath, that she did not omit information from her first report, despite admitting it on

January 17, 2017:

*Joel Wright*:  Did you omit any information related to the case from your first findings report?

*Gina Thurman*:  No, I didn't omit any information.

86.    Jane Roe sent text messages to Mr. Whitaker asking him to come study in the evenings on September 27, 2016 at 6:52:20 pm and the next day on September 28, 2016 at 6:46:27 pm.

87.    Mr. Whitaker declined both offers to come study by Jane Roe.

88.    Two days later on September 30, 2016, Jane Roe reported to the professor (Defendant Wear) that Mr. Whitaker had sexually harassed and touched her without her consent.

89.    During the hearing on May 8, 2017, Jane Roe stated that she never initiated any text messages to Mr. Whitaker and that he texted her, excessively.

90.    The text message records indicated that the text messages were mutual and Jane Roe sent texts to Mr. Whitaker eighteen times while Mr. Whitaker sent fourteen text messages.

91.    Defendant Wear sent the report of the allegation by Jane Roe to the Title IX coordinator (Defendant Reed) on September 30, 2016.

92.    Defendant Wear stated that she never witnessed any inappropriate behavior between the two students during the hearing on May 8, 2017.

**Mr. Whitaker and Jane Roe Both Receive a Copy of the No-Contact Order.**

24

93.    Defendant Reed emailed a notice of the alleged incident to Mr. Whitaker on October 13, 2016, which included a no-contact order that was sent to Jane Roe.

94.    Defendant Reed copied the wrong biology professor on both the 'notice of the alleged incident' and the 'no-contact order' emails; Defendant Wear did not receive the copies.

95.    Mr. Whitaker was not aware that Jane Roe had made an allegation against him until he met with Defendant Reed on October 25, 2016 due to not checking the institutional email; the primary email system that he used was 'Desire2Learn' for completing assignments.

96.    A hold was placed on Mr. Whitaker's account on October 20, 2016 due to his lack of response to the allegation; the sexual misconduct policy does not state that a hold may be placed on the respondent's account due to not responding and the handbook states, "If respondent has not otherwise responded, a non-written response will be considered a general denial of the alleged misconduct."

97.    Jane Roe continued working with Mr. Whitaker until October 25, 2016 when Mr. Whitaker was made aware of the allegation against him and demanded that their lab groups be changed.

98.     Jane Roe made her allegation to Defendant Thurman on October 3, 2016, yet the lab groups were not changed until after Mr. Whitaker met Defendant Reed on October 25, 2016.

99.     Defendant Reed had Mr. Whitaker removed from his ROTC class at 11:00 am on October 25, 2016 in order to respond to the alleged incident; the handbook does not state that removing the respondent from their class will occur if they have not responded to the allegation.

100.    Mr. Whitaker jumped out of his seat when he was made aware of the allegation against him by his lab partner and did not go directly back to his ROTC class after the interview.

101.    Mr. Whitaker stated that he would meet with both Defendant Reed and Defendant Thurman at Bellevue Hall on the Augusta University campus at 3:00 pm after his biology class to respond to the allegation.

102.    Mr. Whitaker demanded that Defendant Reed contact the biology professor (Defendant Wear) to change the lab groups before he went to the class at 1:00 pm.

103.    Defendant Reed called Defendant Wear and told her to change the lab groups at the request of Mr. Whitaker.

**Jane Roe Speaks to Mr. Whitaker Three Times after the No-Contact Order and the Investigator Refuses to Charge her.**

104.    Defendant Wear directed each student in the biology lab where to sit at the beginning of class on October 25, 2016.

105.    Defendant Wear did not assign new locker combinations to Mr. Whitaker or Jane Roe; Defendant Wear had all of the combinations to each locker at each seat.

106.    Jane Roe spoke to Mr. Whitaker on October 25, 2016 while he was taking a picture of the plants they had planted earlier in the semester and stated, "Those are not our plants, these are."

107.    Mr. Whitaker did not respond to Jane Roe and Defendant Wear walked from across the classroom near them.

108.    There was no lab class on the schedule for the following week.

109.    Jane Roe spoke to Mr. Whitaker the second time after the no-contact order on November 8, 2016 when Mr. Whitaker asked another lab member which assignment they were working on and Jane Roe responded to him before the other lab member could respond.

110.    Defendant Wear stated that she heard Jane Roe speak to Mr. Whitaker, yet no action was taken, nor were the groups changed.

111.   Defendant Thurman justified Jane Roe speaking to Mr. Whitaker after the no-contact order by stating in an email on November 30, 2016 to Mr. Whitaker that the contact occurred 'under the supervision of class-related material:'

> "If (*Redacted*) contacted you while the No Contact Letter was in place, outside of the supervision of the class and class related material, you will need to provide with the specific dates, time and content of the contact. Again, (*Redacted*) and Dr. Wear have stated that she did respond to one of your questions in lab after no one else answered the question. If you have evidence of other instances, please let me know."

> (emphasis added.)

112.   No provision in the no-contact order allowed for contact to be made by either party during class or under the supervision of class-related material.

113.   The hearing on May 8, 2017 was chaired by Joel Wright, the Title IX coordinator from Georgia Southern University, in which Defendant Thurman stated that someone else besides Mr. Whitaker had asked the question, despite acknowledging that Mr. Whitaker asked the question in the email on November 30, 2016:

> *Joel Wright*:  Did you follow up with her to ensure that she did not contact him?
>
> *Gina Thurman*:  I did.  She had previously disclosed that to me and I shared that with him, um, that she had spoken, in class, when he--, another student was asking a question, um, and no one answered, that she gave the answer to the question, in class, um, I also followed back up with her and with the department chair, um, to investigate that claim.

*Joel Wright:*  So, did the complainant admit to speaking to the respondent after the No-Contact Directive had been issued?

*Gina Thurman:*  Um, she only admitted to speaking to him in class, when another member of the class that was seated at--, near them asked a question and no one answered, she gave the answer to the question which was something related to the classwork, nothing personal.

(emphasis added.)

114.  Mr. Whitaker reported the incident to Defendant Thurman and

Defendant Reed on November 8, 2016 and they assured him that they would

follow up with Jane Roe to ensure there was no contact; in which Defendant Reed

wrote back on November 10, 2016:

> Good morning DeMarcus,
>
> Gina and I will consult today and follow up with you regarding next steps. <u>In the meantime we will also follow up with (*Redacted*) to ensure there's no contact.</u>
>
> <u>My understanding from Professor Ware was that she modified the groups as soon as I was able to meet with you to inform you of the letter of no contact.</u>
>
> Either Gina or I will be in touch with you as soon as possible to schedule a follow-up meeting as soon as we can gather more information.
>
> Thank you,
> Michele

(emphasis added.)

115.  Jane Roe spoke to Mr. Whitaker the third time on November 15,

2016 by asking him for the weight of a plant; Mr. Whitaker did not respond to her.

116.    The day prior to speaking to Mr. Whitaker, Jane Roe made a written statement against Mr. Whitaker to Defendant Thurman on November 14, 2016, stating that she was uncomfortable working with him.

117.    Defendant Wear acknowledged hearing Jane Roe speak to Mr. Whitaker the third time during the hearing; Defendant Wear did not separate the two students this day, as she had done on October 25, 2016 after speaking to Defendant Reed.

118.    Defendant Wear stated that 'all that was stated was a weight' at the hearing on May 8, 2017, regarding the third time Jane Roe spoke to Mr. Whitaker after the no-contact directive.

119.    Mr. Whitaker ceased attending the class the following week due to heart problems caused by anxiety and demanded to meet with Defendant Reed and Defendant Thurman to report Jane Roe continuing to speak to him after the no-contact order, Defendant Wear not changing the groups, and Defendant Wear's treatment towards him after the allegation was made.

120.    Mr. Whitaker brought forward concerns about Defendant Wear treating him differently in that she complimented a white male sitting next to him in class on his business dress attire and ignoring Mr. Whitaker as they were sitting right by each other wearing similar clothes; in addition to not interacting with Mr.

Whitaker and giving him a look that made him feel uncomfortable when she came into the classroom early.

121.    Mr. Whitaker reported that Defendant Wear became more hostile in the classroom after the allegation against him and began using curse words during class that she did not use before.

### Mr. Whitaker Offered the Names of Five Students to be Interviewed by Defendant Thurman, but She Only Interviewed One.

122.    Mr. Whitaker met with Defendant Reed at her office on November 21, 2016 to give the names of witnesses who saw Jane Roe speaking to Mr. Whitaker and noticed that Defendant Wear did not change the lab groups; Defendant Reed responded by saying, "Wow," when Mr. Whitaker brought up the issue.

123.    Defendant Reed attempted to contact one of the students that Mr. Whitaker provided but did not receive a response:

> "I tried to call (*Redacted*) to get his perspective on the groups, he didn't answer the call and there's no voice mail set up." NOV 21, 2016, MON 12:04 PM, +7068292375 (Michele Reed)

> "Hi DeMarcus, yes, she is on vacation this week and out of the office until next Monday. I would send her another email to request an appt for early next week. Since a commettee reviews a Hardship withdraw, you will need to put into writing the examples of Dr Wares behavior that you believe are retaliation, names of the people who can make statements to the University that the groups are the same and were not modified, along with their contact

information for the committee to follow up. Hope this is helpful. Michele"
NOV 22, 2016, TUE 1:37 PM, +7068292375 (Michele Reed)

"Document your information and see where things go and if you wish to
explore options with Chair of Department I'm sure you can do that on your
own as well."  NOV 22, 2016, TUE 3:47 PM, +7068292375 (Michelle
Reed)

(emphasis added.)

124.    Under oath at the hearing, Defendant Reed stated that her text

messages between Mr. Whitaker were not about the lab groups:

*Joel Wright*:  Did any of those messages or phones contain messages that
were related to lab groups not being changed?
*Michele Reed*:  No.

125.    The handbook states that all witnesses offered by both the

complainant and the respondent will be interviewed.


**Mr. Whitaker Cited that the Retaliation started after he reported the**

**Professor failing to Change the Lab Groups to Defendant Thurman.**

126.    Mr. Whitaker sent a request to meet with Defendant Thurman on

November 22, 2016 to discuss withdrawing from the course and she responded on

November 26, 2016, by writing:

Hi DeMarcus,

Thank you for your email. Do you have some time early next week so that
you and I can meet to discuss your concerns? I spoke to Dr. Wear and she
told me that she changed the groups after speaking with Ms. Reed but that
you and (*Redacted*) were still working together some. She told me that when

32

you asked the question to (*Redacted*), she heard the question and she heard (*Redacted, Jane Roe*) answer when (*Redacted*) did not respond. I will check with her this week to see where (*Redacted, Jane Roe*) was in proximity to you when you asked the question. Is that the only contact that (*Redacted, Jane Roe*) has had with you since the No Contact Letter was put into place?

If you are still interested in withdrawing from the class, please let me know so that we can discuss your options.

(emphasis added.)

127.    Defendant Thurman denied knowing about Mr. Whitaker's request to have the lab groups changed and stated to third parties on March 16, 2016, "I am not aware of any accommodation for Mr. Whitaker that was made in regard to the investigation."

128.    Mr. Whitaker met with Defendant Thurman at her office on November 28, 2016 to discuss withdrawing from the course due to his heart problems caused by the anxiety of Jane Roe violating the no-contact order and Defendant Wear's differential treatment after the allegation was made.

129.    Defendant Thurman gave Mr. Whitaker a 'Hardship Withdrawal' form, which removes a student from all of the classes they are taking.

130.    Defendant Thurman ended the meeting when Mr. Whitaker brought up the issue that Defendant Wear did not follow through with changing the lab groups as instructed by Defendant Reed.

131.    Mr. Whitaker followed up the meeting with Defendant Thurman by

sending an email on November 30, 2016, offering the names of other students who

had knowledge that the groups were not changed by Defendant Wear.

**Defendant Thurman Exposed Mr. Whitaker's Email for the Professor to See.**

132.    Defendant Thurman responded the same day by removing her

supervisors from the email and copying Defendant Wear to be able to read what

Mr. Whitaker had written.

133.    Defendant Thurman told Mr. Whitaker that saying that the professor

'looked at him differently' during class was not proof of retaliation:

> "As I mentioned yesterday, <u>stating that she looked at you
> differently does not meet that criteria under the policy, unless you have
> proof.</u>"
> (emphasis added.)

134.    However, Defendant Thurman used Jane Roe's statement that Mr.

Whitaker would look at her during class against Mr. Whitaker to third parties who

considered his academic grievance on March 16, 2017 without proof, yet told Mr.

Whitaker that he needed proof in order to make the same claim:

> "I also later met with <u>the Complainant who shared that she found Mr.
> Whitaker looking at her during the class.</u>"
> (emphasis added.)

34

135.   Defendant Thurman wrote that filing a false claim against Defendant

Wear could be considered retaliation on Mr. Whitaker's part.

> "I would like to remind you that filing a false claim against Dr. Wear for her participation in this process might also be considered retaliation and she might be able to file a claim or argue that you are retaliating against her."

136.   Defendant Thurman never told Mr. Whitaker that filing a false claim

against Dr. Wear could be considered retaliation prior to this email; of which Mr.

Whitaker reported this email as a threat against reporting the professor to

Defendant Rush and Defendant Reed on December 6, 2016.

137.   Defendant Wear was able to read everything that Defendant

Thurman wrote and Mr. Whitaker's previous email.

138.   Mr. Whitaker told Defendant Thurman that he was uncomfortable

with her exposing his email for Defendant Wear to see.

139.   Defendant Thurman apologized to Mr. Whitaker for exposing his

email and wrote back:

> "I apologize for sharing information with others that you did not want disclosed. However, you have requested a withdrawal from Dr. Wear's class and University Policy requires the professor's agreement with any grade other than a WF after midterm. We are unable to respond to your request without input from Professor Wear."

(emphasis added.)

**Defendant Thurman Instructed Mr. Whitaker to Provide Her with Medical**

**Documentation to be Withdrawn from the Class without Penalty.**

140.   After Defendant Thurman exposed Mr. Whitaker's email for

Defendant Wear to see, she offered him a way to get out of the class without

penalty on December 5, 2016, if he had been to 'counseling regarding his ability to

concentrate':

> "Have you been to Counseling or sought any assistance with your inability
> to concentrate or attend class? As I mentioned before, we will need some
> type of documentation before we can seek any type of withdrawal for you."
> (emphasis added.)

141.   Prior to exposing Mr. Whitaker's email for the professor to see,

Defendant Thurman stated on November 30, 2016, that she would not be able to

offer him a withdrawal from the class:

> "Based on what you have provided I cannot ask for a withdrawal from the
> course. Dr. Wear has stated that she is not willing to allow you
> to withdraw at this time. You have also not contacted her to ask for a
> withdrawal. At this point in the semester, a withdrawal will result
> in a WF for the course, unless Dr. Wear and her Department Chair approve a
> different grade. I would advise you to try to complete the
> course."

142.   Mr. Whitaker met with Defendant Reed and Defendant Rush on

December 6, 2016, who both stated that the investigator (Defendant Thurman)

wore 'quadruple hats' and to give her the medical documentation:

> *Michele Reed*:  Right, so one is--, and unfortunately--, I don't want to say
> unfortunately. Gina wears double, triple, quadruple hats, okay?
>
> *James Rush*:  Quadruple.
>
> *DeMarcus*:  Um-hm.

> *Michele Reed*:  <u>And the role of an Associate Dean is to be on a committee to make decisions for these witness situations.</u>

(emphasis added.)

143.   Defendant Reed advised Mr. Whitaker on what to write when he

goes to see a physician for medical documentation to give to Defendant Thurman:

> *Michele Reed*:  And--, and <u>another suggestion is, as you're writing your summary about how the situation has impacted you</u>...
>
> *DeMarcus*:  Um-hm.
>
> *Michele Reed*:  write about how the situation has impacted you.
>
> *DeMarcus*:  Um-hm.
>
> *Michele Reed*:  I guess, <u>when you're writing it, try not to point the blame at somebody else.</u>
>
> *DeMarcus*:  Okay.
>
> *Michele Reed*:  Okay. Because, again, <u>you wanna say, okay, an allegation came up, I'm going through this process, and it is making me feel x, y, and z...</u>
>
> *DeMarcus*:  Um-hm.
>
> *Michele Reed*:  But, what you don't want to do again is, like, um, uh, continue to--, well, not continue to--, to just--, I guess <u>what I'm saying is just speak from your heart, speak to how you feel and, um, you know, um, get supporting documents to go with that.</u>

(emphasis added.)

144.   Defendant Thurman disclosed to Mr. Whitaker on January 4, 2017

that she served on the committee that reviews medical withdrawals as an additional

job responsibility:

> "<u>As another part of my job responsibilities, I chair the committee who reviews and approves medical withdrawals.</u> The committee also consists of the Director of Student Health and the Director of Mental Health. <u>Since I am</u>

working with you on the Title IX issue, I will not participate in the review of
your documents and will rely on the recommendation of the other two
members of the committee. Normally, the deadline for requests is the last
day of classes for the semester."

(emphasis added.)

## Mr. Whitaker filed a Challenge for Bias against All Involved in Attempting to Have Him Obtain Medical Documentation.

145.    Mr. Whitaker sent a Challenge for Bias to Defendant Thurman,

Defendant Reed, and Defendant Rush on December 9, 2016 for them all

attempting to have him obtain medical documentation; no particular person was

specified, but the group as a whole.


## Defendant Thurman Sent her Report on December 19, 2016 Backdated to November 28, 2016.

146.    Defendant Thurman sent Mr. Whitaker and Jane Roe her first report

on December 19, 2016, yet the date reflected November 28, 2016.

147.    Mr. Whitaker brought claims that Defendant Thurman altered the

date on her first report sent on December 19, 2016 to November 28, 2016 to make

it appear that it was completed before his unspecific challenge for bias that was

sent on December 9, 2016 and altered the date on her second report from January

17, 2017 to December 22, 2016 to make it appear that it was completed before his

formal challenge for bias that was sent on January 12, 2017 in order to fix the

errors pointed out by Mr. Whitaker in her report and for the dates to appear valid.

148.     Defendant Thurman stated during the hearing on May 8, 2017, that

when she clicked to update the date on the report, it did not save:

> *Joel Wright*:  Was and, if so, why was your first findings report dated
> November twenty-eighth, twenty-sixteen?
>
> *Gina Thurman*:  That was a day that I had initially done some work--, or that
> I had some work on the report, um, I had attempted--, there's a form--,
> format within Word that you can change it where it automatically updates
> the date that you work on it, and I had, um, attempted to do that and thought
> it had saved it, but it did not save it, and so when I sent it on the nineteenth, I
> did not pay attention--, did not realize that the date had a previous date on it.
>
> *Joel Wright*:  You stated that the--, can you restate the reason why the, uh,
> date was not changed on December nineteenth when you sent it?
>
> *Gina Thurman*:  Yeah, in Word, there's an option where you can do insert
> date, and you can click that it automatically updates and I had attempted to
> do that function, and somehow it didn't--, the click did not save and so I
> thought that it was going--, I try to do that so that whenever I work on the
> document, it automatically updates to the last date that I work on it, but it did
> not save it and I did not realize that until after I had sent out the report.
>
> (emphasis added.)

149.     Defendant Thurman disclosed the full address and phone number on

file with Augusta University of Jane Roe and Mr. Whitaker on the first page of her

investigation report; these were removed in her second report at the request of Jane

Roe.

150.    Jane Roe threatened Mr. Whitaker in a written statement to the investigator that she would have her boyfriend come and talk to him.

151.    Mr. Whitaker never signed a FERPA release form and neither did Jane Roe as to having their student account information disclosed.

152.    When Mr. Whitaker asked for an advisor he was told by Defendant Rush that he had to provide his own advisor on December 27, 2016, yet Defendant Reed said he could have an advisor appointed by the school on December 28, 2016, with his approval:

> Let me know your availability and if you want Jim Rush and/or an Advisor (of your choice) present for the meeting as well as moving forward for the process, please let me know this as well. <u>During this meeting, I can review how an Advisor may assist you throughout the process and I may be able to assist you to identify someone (at the University and with your approval)</u> depending on what you wish to do.

> (emphasis added.)

153.    Defendant Reed stated at the hearing on May 8, 2017, that she did not tell Mr. Whitaker that he could have an advisor provided by the University:

> *Joel Wright*: In December, sixteenth, did you state that the respondent could have an advisor provided to him by the school?
>
> *Michele Reed*: No.

**Defendant Thurman Included Information in her Report that she Stated she Could Not Include.**

154.    Defendant Thurman stated to Mr. Whitaker on November 30, 2016,

that information regarding the lab groups was outside of the scope of the

investigation and could not be considered in the case, yet does so in her report:

> "During my investigation, of this allegation, I am following the protocol
> outlined in the AU Sexual Misconduct Policy. <u>Any issue that
> falls outside of that area, cannot be considered a part of this case.</u> I
> appreciate you sharing the steps that you feel I should take but I am
> bound to follow the policy and the training that I have received as a Title IX
> Investigator. You have made some allegations in your email
> that do not fall within the scope of this policy and cannot be considered in
> this case."

(emphasis added.)

155.    On December 5, 2016, Defendant Thurman tells Mr. Whitaker again

that including information relating to the lab groups is outside the scope of the

investigation:

> "I would like to state again that Dr. Wear is only a witness in the case that I
> am investigating. <u>You have made claims regarding Dr. Wear that are outside
> of the scope of this investigation.</u>"

(emphasis added.)

156.    After telling Mr. Whitaker that she could not include information

regarding the lab groups, Defendant Thurman does so in her investigation report

sent on December 19, 2016.

157.    Six of the eight points that Defendant Thurman used to find Mr.

Whitaker responsible for sexual harassment were related to the lab groups that

Defendant Wear was to have changed and were not facts relating to the allegation of sexual harassment.

158.    Defendant Thurman included a 'previous, and unrelated, allegation' from a prior semester in her report concerning Mr. Whitaker in which he was never charged or found responsible.

159.    Defendant Thurman stated in her report that Mr. Whitaker shared with her that he sought to 'pursue a relationship' in the prior incident without any proof.

160.    The handbook states that unrelated cases shall be investigated separately unless respondent consents to having them aggregated:

> "*Unrelated charges and cases shall be investigated separately, unless the respondent consents to having them aggregated.*"

161.    Mr. Whitaker neither consented to having the previous allegation aggregated nor had knowledge that Defendant Thurman was going to use the information against him.

162.    Mr. Whitaker challenged Defendant Thurman including the previous, and unrelated, allegation in an email on January 12, 2017.

163.    Defendant Thurman refused to remove the previous allegation from her second report sent on January 17, 2017; the date on the report reflected December 22, 2016.

164.    When questioned at the hearing on May 8, 2017, did not remove the previous, and unrelated, allegation because it was "relevant to her" and that she was "not aware that she had to have his consent:"

> *Joel Wright*: Did the respondent ever consent to having the previous incident aggregated, as required in--, in the Sexual Misconduct handbook? Is that your understanding?
>
> *Gina Thurman*: Uh, <u>I was not aware that he had to consent.</u> Um, that was previous information that we had. Um, <u>had that been the first allegation that I had had, the sanctions might have been different, um, but given that there was a previous complaint, um, um, I choose to use that when making the recommendation for sanctions.</u>
>
> *Joel Wright*: Could you tell us why you didn't remove the previous incident from your second report?
>
> *Gina Thurman*: Um, the--, <u>it was--, it was relevant to me and no one ever asked me to remove it.</u> So, um, it was, again, part of the sanctioning process.
>
> (emphasis added.)

165.    Mr. Whitaker asked Defendant Reed, Rush, and Thurman to remove the previous, and unrelated, allegation due to it conflicting with the objectivity of the case at hand on January 4, 2017 and by email to Defendant Thurman on January 12, 2017; however, Defendant Thurman stated at the hearing that she was never asked by anyone to remove it.

166.    On January 4, 2017, Defendant Reed challenged Mr. Whitaker on removing the previous, and unrelated, allegation and told him they could 'move it to the back of the report if that made him feel more comfortable,' despite the

handbook reading that he had to consent to aggregating a separate case, and

admitting that there was never a charge or finding against him:

> *Michele Reed*:  <u>There was no charge against you.  There was no finding of responsibility.</u>
>
> *DeMarcus*:  Um-hm.
>
> *Michele Reed*:  But, because it's on record at the University, whoever holds that role, it's their responsibility and obligation to know and to look to see if there was anything, previously.  Now, in terms of the finding, <u>we can move what she stated about the previous incident to the back of the report if that makes you feel more comfortable</u> and you can make that as one of your recommendations.
>
> (emphasis added.)

167.   Defendant Thurman stated that she weighted the previous allegation

in the sanction considerations against Mr. Whitaker even though he was never

charged or found responsible.[8]

168.   Defendant Thurman did not change her assertion that Jane Roe

requested the groups to be changed after Mr. Whitaker presented evidence that he

made the request on October 25, 2016.

169.   Defendant Thurman failed to mention in her findings report that Jane

Roe had sent Mr. Whitaker eighteen text messages and only stated that Mr.

Whitaker sent Jane Roe fourteen text messages:

> Attachment F – Copy of cell phone records from Complainant showing incoming/outgoing texts between Complainant and Respondent.  <u>Phone

---

[8] See *supra* ¶¶ 164 and 166.

records indicate that Respondent had incoming texts with Complainant on at least 14 occasions between August 27, 2016 and September 28, 2016.

(emphasis added.)

**Defendant Thurman did not include a Rationale in her Report for Charging Mr. Whitaker with Sexual Harassment.**

170.   Defendant Thurman found Mr. Whitaker responsible for sexual harassment without including a rationale:

"Based upon the factual information obtained during the investigation, I find that the Respondent is responsible for violation of the policy."

171.   Defendant Thurman could not provide a clear answer where her rationale was in the report during the hearing:

*Joel Wright*:  Did you provide a rationale in your findings report for why the respondent was responsible for sexual harassment?

*Gina Thurman*:  Um, yes, it's included in the res--, in the report, um, again, the text messages, the statements made by both parties, um, it's included in the finding and facts and analysis.

*Joel Wright*:  That--, that's where the rationale is included, in the finding and fact...

*Gina Thurman*:  Um-hm...  S--, substantial evidence, yeah.

**Sanctions Defendant Thurman Sought to Impose on Mr. Whitaker.**

172.    Defendant Thurman sought to impose sanctions on Mr. Whitaker at a level above a first offense; Mr. Whitaker was never charged before at the University:

> Sanction Recommendation:  Continuation of No Contact Letter and probation for one academic years (two semesters), 10 hours of community service (at a site approved by the Title IX Coordinator) and a reflection or research paper related to Title IX, to be determined and approved by the Title IX Coordinator.

173.    Defendant Thurman stated at the hearing that the sanctions that she sought to impose would have been different if this was not the first allegation against Mr. Whitaker. [9]

## Defendant Reed Used the Backdated Report to Tell Mr. Whitaker that it was too Late to File a Challenge for Bias.

174.    Mr. Whitaker met with Defendant Reed and Defendant Rush on January 4, 2017 to discuss Defendant Thurman's findings report and ask about his challenge for bias that was filed, but not conducted.

175.    Defendant Reed challenged Mr. Whitaker's challenge for bias on January 4, 2017 by saying that he submitted the challenge after Defendant

---

[9] See *supra* ¶ 164.

Thurman's findings report (sent on December 19, 2016 back-dated to November

28, 2016):

> *Michele Reed*: in terms of her investigation. Um, ya' know, I'll wait 'til he comes down, too. But, one of the things that--, <u>that timing of the--, the recusal and the allegation of bias toward Gina came after the findings report. So, I don't know what we're gonna be able to do about that.</u>

> (emphasis added.)

176.    Defendant Reed then argued that Mr. Whitaker should have sent his

challenge for bias at the beginning of the investigation:

> *Michele Reed*: And, <u>I felt as if you had an opportunity long before when you sent--, long before you sent that email two months later.</u>

> (emphasis added.)

177.    The handbook states that a challenge for bias can be filed at any time

in the investigative process when bias is suspected:

> **Recusal / Challenge for Bias**
> Any party may challenge the participation of any institution official or employee in the process on the grounds of personal bias by submitting a written statement to the institution's designee setting forth the basis for the challenge. <u>The written challenge should be submitted within a reasonable time after the individual reasonably should have known of the existence of the bias.</u> The institution's designee will determine whether to sustain or deny the challenge, and if sustained, the replacement to be appointed.

> (emphasis added.)

178.    Despite the handbook specifying the challenge should be submitted

within a reasonable time after bias should have been known, Defendant Reed told

Mr. Whitaker that he had three days to submit it at the beginning of the

investigation:

> *Michele Reed*: I--, I--, DeMarcus, I did tell you, you have an option, I said you have three days and the let--, the letter, as well as the policy, which I gave to you...
>
> *DeMarcus*: Um-hm.
>
> *Michele Reed*: said that you have three days to let me know if you're in agreement with who the investigator is.
>
> *DeMarcus*: I don't recall that.
>
> *Michele Reed*: I say that to everybody.
>
> *James Rush*: Well, do ya' have the letter?
>
> *Michele Reed*: I--, yeah. (Sigh), has been assigned, uh, to meet--, once an investigator has been--, <u>this doesn't go into you have three business days to...</u>
>
> *DeMarcus*: Um-hm. 'Cause that never been told to me.
>
> (emphasis added.)

179.    Defendant Reed told Mr. Whitaker that it would be 'my word against

yours' regarding telling him that he had three days to file a challenge for bias:

> *Michele Reed*: I did tell you. <u>I did tell you, but again, it's gonna be a my word against your word.</u> But, I'm telling you that that's what this letter says and that is what I stated to you, verbally.
>
> (emphasis added.)

180.    Mr. Whitaker recorded the meeting using his cell phone.


**Defendant Reed's Cell Phone Went Missing with No Explanation.**

181.   Defendant Reed stated that she lost the phone when Mr. Whitaker asked about if she still had the text messages between them about the sending names of his witnesses:

> *DeMarcus*: Okay.  Okay.  Now, you--, with the--, another thing about those text messages, you say, you don't have that phone, anymore with the text messages?  'Cause, I know you--, noticed you start--, you started sending me text messages from another number.
>
> *Michele Reed*: Uh-huh.
>
> *DeMarcus*: So, you don't--, you still don't retain those text messages that we...
>
> *Michele Reed*: <u>The police are investigating were the phone is.  They're tracking it down.</u>
>
> *DeMarcus*: You lost it, or something?  Or somebody stole it?  Or...
>
> *Michele Reed*: <u>They're--, police are tracking it down.</u>
>
> *DeMarcus*: Hm.  Really?  What happened?
>
> *Michele Reed*: I have no idea.
>
> *DeMarcus*: Oh, okay.  Okay.  Hm.  Interesting.  Alright, well, I do have all those text messages, um, just in case something like that happened.
>
> *Michele Reed*: Um-hm.
>
> *DeMarcus*: Um, I just gotta make sure I--, I make copies of it, um, uh, but, that's--, so, you say, with the phone, you don't know what happened to it?  You just left it laying around?
>
> *Michele Reed*: It's--, <u>I have the messages 'cause it's from my data.</u>
>
> *DeMarcus*: Um-hm.
>
> *Michele Reed*: <u>It's from the data and it's from the, um, it's from the--, the account.  So, I have all the information.</u>

(emphasis added.)

182.     During the hearing on May 8, 2017, Defendant Reed changed from what she told Mr. Whitaker on January 4, 2017; in which she said that she did retain the text messages and could provide them to him:

> *Joel Wright*: Did you state during an interview with the respondent that the police were tracking your cell phone down?
>
> *Michele Reed*: I--, I think I said that I issued, uh, a police report.  Yes. 'Cause we have to.  It's a work-issued phone.  We have to file a report.
>
> *Joel Wright*: Did you give--, provide the respondent a reason as to why and how it was lost?
>
> *Michele Reed*: No.
>
> *Joel Wright*: <u>Did you tell the respondent that you retained the text messages that you sent him?</u>
>
> *Michele Reed*: <u>No.</u>
>
> *Joel Wright*: <u>Are you able to produce the text messages that you sent to the respondent?</u>
>
> *Michele Reed*: <u>No.</u>
>
> *Joel Wright*: Did you, in fact, file a police report...
>
> *Michele Reed*: Uh, yes.
>
> *Joel Wright*: for the... Do you recall when that was?
>
> *Michele Reed*: I do not.
>
> (emphasis added.)

**Defendant Reed and Defendant Thurman Changed Their Reasons for**

**Charging Mr. Whitaker Three Times.**

183.     Defendant Thurman and Defendant Reed changed the reasons for why Mr. Whitaker was charged three times throughout the investigation.

184.    First, Defendant Thurman stated on November 30, 2016, that Mr. Whitaker was being investigated to see if he continued to text Jane Roe after she told him to stop:

> "I am investigating an allegation by (*Redacted*) that you harassed her by continuing to contact her outside of the group email after she told you to stop and that you touched her without her consent."

185.    Second, after Jane Roe was unable to produce the content of the text messages between them, Defendant Thurman said on January 27, 2017, that he said that he never sent text messages, directly, to Jane Roe:

> "Upon my initial interview with you, when Ms. Reed was present, you stated that you did not text (*Redacted*) outside of the group text and asking her to study outside of the group. The phone records indicate that there were text messages between just you and (*Redacted*) that were not part of a group text."

186.    Third, Defendant Reed stated during the hearing on May 8, 2017, that Mr. Whitaker was charged because of his 'identifying behavior, words, and actions':

> *Joel Wright*:  Why was the responding party charged with sexual harassment?
>
> *Michele Reed*:  Based upon what was shared initially at the intake appointment with the complainant, um, and some of the items that were shared.  Uh, that's the--, the identifying behavior, and words, or actions were needing to be looked at for that particular category based on what was shared at that intake meeting.

(emphasis added.)

## A Bias Investigation is Initiated against Defendant Thurman and Defendant Reed.

187.     Mr. Whitaker issued a challenge for bias against Defendant Thurman and Defendant Reed on January 12, 2017 that was investigated by Defendant Woods from East Georgia State College.

188.     Defendant Woods and Mr. Whitaker met on February 23, 2017, to discuss his claims of bias against Defendant Thurman and Defendant Reed.

189.     Mr. Whitaker drove to East Georgia State College on March 7, 2017, to hand-deliver a USB flash drive to Defendant Woods with all of the interviews that he recorded prior to for her to consider in her investigation; the USB flash drive was returned to Mr. Whitaker on April 28, 2017.

## Mr. Whitaker Received Incomplete Bias Investigative Results.

190.     Defendant Woods returned a finding of no bias on the part of both Defendants Reed and Thurman in which she wrote on March 23, 2017:

> "Upon review of all information provided by the respondent and Augusta University representatives, I did not find evidence of bias on the part of the Augusta University Title IX Coordinator or Title IX Investigator."

191.     Due to the brevity of the findings, Mr. Whitaker demanded a more thorough explanation of how Defendant Woods reached her conclusion, in which she wrote on April 5, 2017, that she would provide him the information:

Mr. Whitaker - I am working on making arrangements to return the thumb drive to you. <u>Upon completion of the requested information regarding the bias review, I will email it to you.</u>

Thank you,

Tracy Woods

(emphasis added.)

192.    The Human Resource Director, Debra Arnold, and Defendant Reed

ensured Mr. Whitaker on April 5, 2017, that they would follow up with Defendant

Woods to provide a more thorough explanation:

> *Debra Arnold*: <u>you know, it is just a short response letter. So, I think, uh, what you're looking for is a response to each of your concerns. And, so, maybe, that's what we could talk to her about.</u>
>
> *DeMarcus*: Yeah.
>
> *Debra Arnold*: Like, how did she come…
>
> *DeMarcus*: Exa--, exactly.
>
> *Debra Arnold*: <u>Like, can you hit each point for--, for the record. Can I see how you decided on each point.</u>
>
> *DeMarcus*: Exactly. That's--, um-hm.
>
> *Debra Arnold*: Okay. So, we--, <u>that's definitely something we could talk to Tracy about, don't you think?</u>
>
> *Michele Reed*: <u>Yeah, I think we can…</u>
>
> (emphasis added.)

193.    Defendant Woods never returned any information concerning a

critical analysis of her findings that she, and the University, promised to Mr.

Whitaker.

194.   Defendant Woods stated that she interviewed both Defendant Thurman and Defendant Reed, however did not provide any notes from those interviews or dates when they were conducted; nor did Defendant Reed provide a report of the information that Mr. Whitaker provided to her.

195.   Mr. Whitaker stated that he would be sending additional evidence to Defendant Woods on; however, she cleared Defendant Thurman and Defendant Reed of having any bias before he could do so.

**The Bias Investigation is called into Question based on the Partnership Between Augusta University and East Georgia State College.**

196.   Mr. Whitaker made claims of a conflict of interest between East Georgia State College and Augusta University that compromised the integrity of the bias investigation to Defendant Rush on May 5, 2017.

197.   On April 5, 2017, The Human Resource Director, Debra Arnold, stated that Defendant Woods was chosen to conduct the bias investigation because of her 'proximity':

> *Debra Arnold*: So, um, I don't know if we could find any one school--, <u>I think because of her proximity that was the--, the…</u>
>
> *DeMarcus*: Yeah. Convenience.
>
> *Debra Arnold*: <u>closest person.</u> Yeah. But, um, the relationship with East Georgia, I would really have to look into that. I--, you know, um…
>
> (emphasis added.)

198.   Mr. Whitaker met with the Director of East Georgia State College-Augusta, Nick Kelch, at Augusta University on April 28, 2017, who disclosed that there were some "qualms" about the partnership and that the partnership was mainly based on financial issues associated with the University.

199.   Augusta University and East Georgia State College renewed their partnership on September 20, 2017 to extend beyond the original August 1, 2017 expiration date to August 1, 2022; the partnership was established August 1, 2013.

**Mr. Whitaker Reported False Statements Given at the Hearing by Jane Roe, Defendant Thurman, and Defendant Reed that went Uninvestigated.**

200.   Defendant Reed stepped down as chair for the hearing due to Mr. Whitaker's claim of retaliation against her.

201.   Joel Wright, the Title IX coordinator at Georgia Southern University, was selected to chair the hearing on May 8, 2017.

202.   During Mr. Whitaker's opening statement, he had an emotional reaction upon mentioning his divorce and had to step outside of the room.

203.   After the hearing, Mr. Whitaker reported to Defendant Rush, Legal Affairs, Human Resources, and the Chief Audit Officer Clay Sprouse, that false

statements were made by Jane Roe, Defendant Thurman, and Defendant Reed in writing on May 15, 2017, that were never investigated or responded to.[10]

204.    The hearing chairman, Joel Wright, and the hearing panel did not follow through with disciplinary action against the three parties regarding the inconsistent statements made during the hearing despite hearing and questioning some of them and having evidence in their hands that contradicted some of the statements given; including Jane Roe's statement that Mr. Whitaker texted her excessively and that she ceased responding to him, which the phone records indicated the messages were mutual and she texted him eighteen times while he texted her fourteen times.

205.    During the hearing on May 8, 2017, Defendant Thurman stated that Mr. Whitaker admitted to giving Jane Roe a massage with no evidence; prior to the hearing, Defendant Thurman did not mention this allegation in either of her investigation reports.

206.    Jane Roe stated that she did not send Mr. Whitaker text messages to come study directly, which the text message records indicated otherwise.[11]

207.    Defendant Thurman equivocated by telling Mr. Whitaker that he needed substantial evidence to make an allegation of the professor or Jane Roe

---

[10] A previously cited false statement by Defendant Thurman is identified at ¶¶ 84-85.
[11] See *supra* ¶ 86.

staring at him, yet not telling Jane Roe that she needed substantial evidence to

make the same allegation, and sharing Jane Roe's statement with third parties:[12]

> *Joel Wright*: Did you tell the respondent in an email, that you could not consider instances of where he reported that the complainant kept looking at him during class?
>
> *Gina Thurman*: I did explain to him that <u>the specific example given to us by the, um, attorneys for the--, the Board of Regents, um, was that substantial evidence included more than just looking at someone...</u> And when the respondent stated that the complainant was looking at him, the complainant also stated that the respondent was looking at her.
>
> *Joel Wright*: Did you tell the respondent that he needed evidence, not just his word?
>
> *Gina Thurman*: Yes, <u>I explained to him that I needed substantial evidence and that substantial evidence included more than just someone was looking at him, differently.</u>
>
> *Joel Wright*: In an email concerning his academic grievance, did you state that the--, did you state that the respondent continuously looked at the complainant during class?
>
> *Gina Thurman*: <u>I stated that the complainant shared that the respondent was looking at her during class.</u>
>
> *Joel Wright*: <u>Was that different than what you told him?</u>
>
> *Gina Thurman*: <u>No, that was the same.</u>
>
> (emphasis added.)

208.    Defendant Thurman stated that Mr. Whitaker did not challenge her to

remove the previous allegation from her report; records indicate that Mr. Whitaker

did do so in an email sent to her on January 12, 2017:

> *Joel Wright*: Did the respondent challenge the rationale behind including a previous incident in your report, after you had included it?

---

[12] See *supra* ¶¶ 133-134.

*Gina Thurman*:  Not to me, no.

209.    Defendant Thurman referred to the previous complainant as a

'victim,' yet an investigation was never sought after or merited.

210.    Defendant Reed equivocated by first stating that Defendant Wear

received a copy of the no-contact order by email and then stating that she sent the

no-contact order to the wrong biology professor:

> *Joel Wright*:  <u>Did you send an email notifying Dr. Wear of the No-Contact Directive?</u>
>
> *Michele Reed*:  <u>Yes.</u>
>
> *Joel Wright*:  Did you copy the wrong professor on the email to the responding party?
>
> *Michele Reed*:  Say that one more time.
>
> *Joel Wright*:  <u>Did you copy, on the email, the wrong professor you emailed to the responding party?</u>
>
> *Michele Reed*:  <u>Yes, I believe.  Yeah.</u>
>
> (emphasis added.)

211.    On April 5, 2017, Defendant Reed stated that the professor never

received a copy of the no-contact order and told Mr. Whitaker that she told her,

verbally, on October 25, 2016:

> *DeMarcus*:  But, in the no-contact letter, it says--, it says, uh, (*Redacted*) has been notified of this request, the no-contact letter--, letter applies to direct contact, um, your professor for the biology class will be copied on this letter and she will be informed that you can remain in class.  However, she wasn't copied in the letter.  So, she was the wrong teacher.

*Michele Reed*: <u>She was informed, verballed, from the very beginning when the--, when the complainant came forward and requested, as an interim measure, she, verbally, was notified by me via the phone.</u>

*DeMarcus*: Do you have evidence of that?

*Michele Reed*: Yes. It's documented. Yes.

*DeMarcus*: Hm. Okay.

*Michele Reed*: Via phone records.

(emphasis added.)

212.   Defendant Thurman first admitted to meeting with Mr. Whitaker on

October 25, 2016 when questioned by the Chairman:

*Joel Wright*: Did you meet with the respondent on October twenty-fifth, twenty-sixteen?

*Gina Thurman*: Um, yes. I did.

213.   However, Defendant Thurman changed her testimony and said that

she did not meet with Mr. Whitaker on October 25, 2016 after being questioned

about Defendant Wear changing the lab groups on that date:

*Joel Wright*: Did you speak to the responding party on October twenty-fifth?

*Gina Thurman*: On October twenty-fifth, um, no, I do not have that I spoke with him on the twenty-fifth... I spoke with him on the twenty-second and on the twenty-sixth.

214.   Mr. Whitaker did not speak with Defendant Thurman on October 22,

2016 or October 26.

215.   Defendant Wear contradicted Jane Roe, Defendant Thurman, and

Defendant Reed's assertion that Jane Roe asked for the lab groups to be changed

by relaying that Mr. Whitaker asked for the lab groups to be changed on October

25, 2016:

> *Joel Wright*: Did Ms. Reed instruct you to change the lab groups at the request of the responding party?
>
> *Dr. Wear*: Yes.

### The Hearing Panel Found Mr. Whitaker 'Not Responsible.'

216.    The hearing panel found Mr. Whitaker 'Not Responsible' for sexual

harassment on May 12, 2017, based on the following rationale:

- No witness to inappropriate touching was made available
- No witness to conversation indicating sexual harassment was made available
- No other verifiable evidence was presented indicating sexual harassment occurred
- Call logs do not support contact after issuance of "No Contact" notice was given
- The Professor of the course, Dr. Wear, indicated she did not witness a change in behavior between (*Redacted*) and Mr. Whitaker and neither student asked Dr. Wear to be moved while in either the classroom or lab locations

217.    Mr. Whitaker reported to be moved to Defendant Reed and

Defendant Thurman after reporting that Defendant Wear was treating him different

after the allegation was made.

218.    Jane Roe did not appeal the outcome of the hearing panel after being

given five days to do so.

### The Chief Auditor Refused to Audit the Title IX Department.

219.    Mr. Whitaker met with Defendant Rush on May 3, 2016, to request an audit on the Title IX department at Augusta University, in which he responded, 'Who's going to pay for it?' and referred him to speak with the Chief Audit Officer of Internal Audits, Clay Sprouse.

220.    On May 5, 2017, Mr. Whitaker met with Mr. Sprouse to discuss risks associated with the Title IX department at the Augusta University Audit department, in which Mr. Sprouse said that Defendant Thurman should have recused herself from the investigation and that he would not perform an audit on the Title IX department due to the University facing a 22 million-dollar lawsuit:

> *Clay Sprouse*:  I'm okay with her getting--, being there and everything…
> *DeMarcus*:  Yeah, yeah.
> *Clay Sprouse*:  <u>But, if, um, it gets to a point where she might be conflicted about something…</u>
> *DeMarcus*:  Yeah.
> *Clay Sprouse*:  <u>there should be a mechanism in there to say, "I'm out."</u>
> (emphasis added.)

221.    After Mr. Whitaker was found 'not responsible,' by the hearing panel he called Mr. Sprouse on May 15, 2016 to re-request an audit of the Title IX department, in which Mr. Sprouse stated that he was not going to honor his request and said, "You were found not responsible, isn't that what you wanted?"

**Mr. Whitaker's Counterclaim Goes Uninvestigated.**

222.    Mr. Whitaker submitted a counterclaim against Jane Roe for

violating the no-contact order in the form of documentation on April 25, 2017; the

envelope was stamped "received April 26, 2017" by the Title IX department.

223.    Defendant Byrdsong was assigned by Defendant Rush to investigate

Mr. Whitaker counterclaim and contacted him on June 13, 2017; 32 days after Jane

Roe had graduated:

> Good evening Mr. Whitaker,
>
> <u>My name is Dr. Quincy Byrdsong and I have been assigned to investigate
> your Title IX complaint.</u> My availability is pretty open during the summer. I
> am not sure when you are on campus but, I would like to arrange a time for
> us to discuss your case at a convenient time for you. Email is the best way to
> contact me but I may also be reached at 706-721-9272. I look forward to
> your response.
>
> (emphasis added.)

224.    Defendant Rush stated that they did not investigate Mr. Whitaker

claim because they 'wanted to wait until Jane Roe's was finished.'

225.    Jane Roe never received notice that a counterclaim investigation had

been opened against her as Mr. Whitaker did.

226.    Defendant Byrdsong was not a Title IX investigator and worked in

the Office of Diversity and Inclusion as the Chief Diversity Officer, nor did

Defendant Byrdsong receive training on Title IX investigations.

227.    Defendant Byrdsong wrote to Mr. Whitaker on August 8, 2017 in
which Mr. Whitaker responded on August 9, 2017 with a request to meet the
following week; Defendant Byrdsong never responded.

228.    On November 8, 2017, Mr. Whitaker met with the Dean of Students,
Scott Wallace, to discuss the appeal of Mr. Whitaker's counterclaim that
Defendant Rush rejected.

229.    Mr. Wallace disclosed that Defendant Byrdsong had left the
University during the summer.

230.    Defendant Byrdsong was under investigation by the University for
disciplinary issues, yet was selected by Defendant Rush to investigate Mr.
Whitaker's counterclaim.

231.    Despite denying Mr. Whitaker's counterclaim, Mr. Wallace admitted
that there was no provision in the no-contact order that allowed for contact to be
made during class, yet chose not to hold Jane Roe accountable for violating it.

## Defendant Rush Dismissed Mr. Whitaker's Counterclaim without a Hearing or Investigation.

232.    Defendant Rush told Mr. Whitaker that Jane Roe was out of the
University's jurisdiction because she had graduated:

233.   However, the Student Misconduct policy states under 'University

Conduct System Authority and Jurisdiction:'

> "Each student is responsible for his or her conduct from the time of
> application of admission through the actual awarding of a degree, even
> though conduct may occur during periods between terms of actual
> enrollment and even if the conduct is not discovered until after a degree is
> awarded."

(emphasis added.)

234.   Defendant Rush and Angelica Hardison told Mr. Whitaker on August

16, 2017, that they would not make him aware of any sanctions against Jane Roe if

they did charge her to violating the no-contact order:

235.   However, Jane Roe was made aware of any possible sanctions that

Mr. Whitaker would have received if he was found responsible for sexual

harassment by receiving a copy of Defendant Thurman's investigative reports on

December 19, 2016 and January 17, 2017.

236.   On August 16, 2017, Mr. Whitaker met with Defendant Rush and

Angelica Hardison to discuss discrepancies throughout their investigation, in

which James Rush responded by asking Mr. Whitaker, "Are you perfect?"

237.   Defendant Rush asked how Mr. Whitaker was affected by the

discrepancies of the investigation and after Mr. Whitaker responded that he

suffered a divorce, Defendant Rush stated, "I don't think your divorce has

anything, necessarily, to do with this case."

238.    Defendant Rush attempted to have Mr. Whitaker's advisor, Deborah Collier, speak during meetings; of which the handbook states that advisors may not participate directly during any proceedings.

239.    Mr. Whitaker followed the guidelines and refused to allow his advisor to speak.

## The Board of Regents of the University System of Georgia's 'Discretionary Review' Final Decision.

240.    The Board of Regents agreed that Mr. Whitaker's failing grade in the biology class was due to the professor's actions and, or, inactions and instructed Augusta University to change his failing grade to a withdrawal from the course.

241.    The withdrawal grade recorded still required Mr. Whitaker to pay back the financial assistance provided by the Army's Tuition Assistance program.

242.    The Board of Regents failed to address Mr. Whitaker's counterclaim that was submitted against Jane Roe for violating the no-contact order.

243.    The Board of Regents responded after Mr. Whitaker wrote that all of his claims were not addressed on May 31, 2018:

> "The Discretionary Review Committee reviewed your complaint and, based on the material presented, made the determination that withdrawing you from BIOL 1108, removing the grade that you received, and allowing you an opportunity to retake the course in the future was the appropriate course of action based on the materials."

## Mr. Whitaker Reported Six Conflicts of Interest throughout the Investigation.

244.    Mr. Whitaker identified six conflicts of interest throughout the investigation:

245.    (i) Defendant Thurman held positions outside of her role as a volunteer Title IX investigator including: Assistant Dean of Student Life & Enrollment, Student Counseling and Psychological Services Supervisor (of which Jane Roe received counseling from Augusta University), Office of Testing and Disability Services Supervisor, Campus Assessment Response and Evaluation Team Chairperson (of which Defendant Thurman attempted to have Mr. Whitaker submit medical documentation to her to make a decision on removing him from the biology class), and Deputy Title IX coordinator.

246.    (ii) Defendant Reed worked as the Title IX coordinator under the supervision of Defendant Rush, who serves as 'general counsel' for Augusta University and does not report directly to the president.

247.    (iii) Defendant Rush dismissed Mr. Whitaker's counterclaim without informing him that he had taken authority over his claim while serving as a lawyer, or 'general counsel,' for Augusta University.

248.    (iv) Defendant Woods was selected by Augusta University officials from East Georgia State College, which is a college that they have a partnership with and share financial assets and resources since May 14, 2013.

249.    (v)  Defendant Woods served as the Title IX coordinator from East Georgia State College, yet also had the role of Human Resources Director.

250.    (vi) Defendant Byrdsong was selected by Defendant Rush to investigate Mr. Whitaker's counterclaim, yet held the additional role of Chief Diversity Officer in the office of Diversity and Inclusion, not reporting directly to the Title IX coordinator, Defendant Reed.

**Title IX Training Records for Augusta University Unaccounted for and No Budget Assigned for Investigations.**

251.    East Georgia State College provided documentation of Defendant Woods training and certifications from ATIXA (Association for Title IX Administrators) for 2016 and 2017 upon request.

252.    Augusta University did not provide records of training and certifications for any person involved in Mr. Whitaker's case assuming a Title IX position:

> The second attachment of your request seeks "[a]ny and all Title IX training records for James Rush, Michele Reed, Gina Thurman, Tracy Woods, and Quincy Byrdsong, including the dates, content, and the trainer, during 2016 and 2017. Again, we do not maintain records in the manner that you have

<u>requested</u>, but in an effort to demonstrate that personnel have been involved in extensive training, we have attached a list of training involving the listed personnel.

(emphasis added.)

253.    The list that Augusta University provided is unable to be verified as the records and emails provided from East Georgia State College.

254.    There was no training regarding 'Due Process Rights of the Accused' or training regarding how to conduct an investigation in response to a 'Challenge for Bias/Recusal' from either Augusta University or East Georgia State College.

255.    The Challenge for Bias investigation was delayed after Mr. Whitaker filed it until Augusta University could receive guidance from the Board of Regents on how to conduct it, as Defendant Thurman wrote on January 17, 2017:

I understand that you have challenged my involvement in this investigation and <u>we are awaiting clarification from the Board of Regents on your charge. Until we receive an update on how to proceed,</u> I have reviewed your response to the report and have made some changes.

(emphasis added.)

256.    Augusta University did not provide records regarding any budget assigned for Title IX investigations:

The first part of your request seeks budget records for Title IX investigations at Augusta University for fiscal years 2016 and 2017. <u>We do not maintain any records in the manner that you have requested.</u>

(emphasis added.)

### ·Mr. Whitaker Reported Three FERPA Violations by Defendant Thurman and Defendant Rush.

257.    Throughout the Title IX investigation, Augusta University personnel committed three violations of the Family Educational Rights and Privacy Act (FERPA).

258.    Defendant Thurman exposed Mr. Whitaker's email for the professor to see without his consent regarding the investigation.

259.    Defendant Rush did not produce a copy of the hearing requested on May 26, 2017 until September 1, 2017; past the 45-day federal guideline.

260.    Defendant Thurman included both Mr. Whitaker's and Jane Roe's full home address and phone number on the first page of her investigative report, which was removed in her second report at the request of Jane Roe.

### Open Record Requests Submitted by Mr. Whitaker.

261.    Mr. Whitaker submitted open record requests for various Title IX information including the training records of Title IX personnel and only received records from Defendant Woods.

### Damages.

262.    Mr. Whitaker suffered damages in the form of not receiving his tuition back that was paid for the Fall 2016 semester, being forced to drop out of

his Biology class and failing his Macroeconomics class due to the unnecessary

stress which triggered back spasms, having to receive counseling for damages to

physical wellbeing, emotional and psychological damages, damages to reputation,

past and future economic losses, loss of educational and career opportunities with

the Army from no longer being in the ROTC program to becoming an officer, and

loss of future career prospects.

## V. CAUSES OF ACTION

### COUNT ONE
### DISCRIMINATION ON THE BASIS OF GENDER IN VIOLATION OF
### TITLE IX OF THE EDUCATION AMENDMENTS OF 1972,
### 20 U.S.C. § 1681
(Against Defendant Board of Regents)

263.    Plaintiff repeats and realleges each and every allegation hereinabove

as if fully set forth herein.

264.    Augusta University and East Georgia State College are recipients of

federal funding and subject to Title IX liability.

265.    Mr. Whitaker experienced discrimination and harassment in which

officials with authority, including the Board of Regents, had actual knowledge of

and failed to adequately respond to and remedy; such as Jane Roe violating the no-

contact order three times and not even being investigated; Defendant Woods not

giving him a rationale for her decision to not remove the investigator or Title IX

coordinator; Mr. Whitaker's reports of false statements made at the hearing being ignored via email; not interviewing all of Mr. Whitaker's witnesses; telling Mr. Whitaker that no responding to the allegations would be used against him; assigning personnel with conflicts of interest; not providing Mr. Whitaker with a hearing for his counterclaim; Defendant Reed ignoring his claims of retaliation against her via email; not providing Mr. Whitaker with a rationale for charging him; using a previous, and unrelated, allegation in which Mr. Whitaker was not charged, or investigated, against him; Defendant Rush telling Mr. Whitaker that Jane Roe was out of the university's jurisdiction because she had graduated when the handbook says she is not and that they did not investigate his complaint against Jane Roe because they wanted to wait until his investigation was finished, of which Jane Roe had already graduated; and Angelica Hardison telling Mr. Whitaker that they would not inform him if they did charge Jane Roe for violating the no-contact order.

266.    The Board of Regents failed to adequately deal with the student-on-student harassment and charge Jane Roe with violating the no-contact order, failed to address the false statements given at the hearing, and the officials at Augusta University and East Georgia State College were deliberately indifferent to Mr. Whitaker's reports by not responding to emails and Defendant Rush telling him to 'sue us.'

267.    The discrimination was severe, pervasive, and objectively offensive due to ignoring Jane Roe violating the no-contact directive and multiple officials not taking action to remedy the discrimination.

268.    The discrimination barred Mr. Whitaker access to the educational opportunities and benefits because he did not receive equal treatment when submitting his counterclaim and withdrew from the university after the Fall 2016 semester.

## COUNT TWO
## DISCRIMINATION ON THE BASIS OF RACE AND COLOR IN VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000d
(Against Defendant Board of Regents)

269.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

270.    Plaintiff is an African American that received treatment that was less favorable compared to Jane Roe; who was fair skin in relation to Mr. Whitaker. Also, the investigator, the Title IX coordinator, and the bias investigator were all Caucasian females that made decisions on Mr. Whitaker's investigation based upon Jane Roe's complaint.    .

## COUNT THREE
## VIOLATION OF OF THE 5th AND 14th AMENDMENT TO THE UNITED STATES CONSTITUTION

72

**Procedural and Substantive Due Process, 42 U.S.C. §1983**
(Against Defendants Board of Regents, Rush, Reed, Thurman, Byrdsong, and Woods in their official capacities for injunctive relief and against Defendants Board of Regents, Rush, Reed, Thurman, Byrdsong, and Woods in their personal capacities for money Damages)

271.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

272.    Defendants violated Mr. Whitaker's procedural due process rights by:

(i)     Assigning personnel with conflicts of interest;

(ii)    Including an unrelated allegation in the investigation against him without his consent;

(iii)   Telling him that not responding to the allegation would be used against him;

(iv)    The wrong professor receiving the no-contact order;

(v)     Not recording his interviews with them;

(vi)    Giving false statements during the hearing under oath;

(vii)   Not investigating his counterclaim;

(viii)  The professor failing to change the lab groups when instructed by the Title IX coordinator;

(ix)    The challenge for bias investigation was incomplete due to never receiving a rationale after being told he would or a summary of the interviews conducted;

(x)     Only one of Mr. Whitaker's five witnesses were questioned;

(xi)    Jane Roe did not receive a notice of an investigation being raised against her in Mr. Whitaker's counterclaim;

(xii)  Defendant Thurman omitted information that Mr. Whitaker gave her from her investigation report; and

(xiii)  Defendant Byrdsong was assigned to investigate Mr. Whitaker's counterclaim despite being under investigation and the university having other investigators who were available.

(xiv)  Defendant Rush stated that they did not investigate Mr. Whitaker's counterclaim because they wanted to wait until after Mr. Whitaker's investigation was finished.  Mr. Whitaker was not informed that they were acting upon his complaint until after Jane Roe had graduated.

273.    Defendants violated Mr. Whitaker's substantive due process rights by:

(i)    the false statements given at the hearing not being addressed by the hearing chairman or the chief integrity officer, Defendant Rush (email was never responded to.);

(ii)    the Board of Regents failed to address Jane Roe violating the no-contact order in their discretionary review after Mr. Whitaker submitted the information to them;

(iii)   the Bias investigator, Defendant Woods, failed to remove the Title IX coordinator and investigator due to conflicts of interest; and

(iv)   the investigator refused to charge Jane Roe with violating the no-contact order by stating that it was okay for her to speak to Mr. Whitaker during class, which the no-contact order states is not authorized.

## COUNT FOUR
## VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE 14th AMENDMENT TO THE UNITED STATES CONSTITUTION PURSUANT TO 42 U.S.C. § 1983

(Against Defendants Rush, Reed, Thurman, Byrdsong, and Woods in their official capacities for injunctive relief; and against Defendants Rush, Reed, Thurman, Byrdsong, and Woods in their personal capacities for money damages)

274.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

275.    Defendants failed to provide equal protection to Mr. Whitaker by providing Jane Roe with protections that Mr. Whitaker did not receive. Jane Roe made false statements during the hearing that were not investigated or addressed even after Mr. Whitaker sent emails that were never responded to. Title IX officials made statements that favored Jane Roe over Mr. Whitaker. Mr. Whitaker never received a hearing or an investigation report for his counterclaim, and the bias investigator, Defendant Woods, failed to remove the investigator and Title IX coordinator despite their conflicts of interest and failed to state reasons for not doing so. Defendant Rush told Mr. Whitaker that Jane Roe was out of the university's jurisdiction because she had graduated when the handbook says she is not and Angelica Hardison told Mr. Whitaker that they would not inform him if they did charge Jane Roe for violating the no-contact order. Defendant Rush stated that they did not investigate Mr. Whitaker's complaint against Jane Roe because they wanted to wait until his was finished, of which Jane Roe had graduated, yet he submitted it while she was enrolled. Also, the investigator refused to charge Jane Roe with violating the no-contact order and told Mr. Whitaker that it was okay for

her to speak to him during class, which the no-contact order states was not

authorized.

## COUNT FIVE
### RETALIATION IN VIOLATION OF THE 1st AMENDMENT OF THE UNITED STATES CONSTITUTION PURSUANT TO 42 U.S.C. § 1983
(Against Defendants Board of Regents, Rush, Reed, Thurman, Byrdsong, and Woods in their official capacities for injunctive relief and against Defendants Board of Regents, Rush, Reed, Thurman, Byrdsong, and Woods in their personal capacities for money Damages)

276.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

277.    Mr. Whitaker reported retaliation and discrimination by the professor and Title IX personnel that was not acted upon and was charged with sexual harassment for refusing to obtain medical documentation to be removed from his biology course without penalty as a tradeoff for not reporting the professor for negligence and discrimination.  Further actions include Defendant Thurman exposing Mr. Whitaker's email against the professor for her to see without his consent; Defendant Reed ignoring Mr. Whitaker's report of retaliation against her by hanging the phone up in his face and not responding to his email report against her; Defendant Woods refusing to provide reasons for her not finding bias; Defendant Rush telling Mr. Whitaker that Jane Roe was out of the university's jurisdiction because she had graduated when the handbook says she is not;

Angelica Hardison telling Mr. Whitaker that they would not inform him if they did

charge Jane Roe for violating the no-contact order; and Defendant Rush dismissing

Mr. Whitaker's Title IX counterclaim without an investigation or hearing.  Also,

the investigator refusing to charge Jane Roe with violating the no-contact order

after Mr. Whitaker reported the violations.

## COUNT SIX
## VIOLATION OF THE RIGHT AGAINST SELF-INCRIMINATION CLAUSE OF THE 5th AMENDMENT TO THE UNITED STATES CONSTITUTION
## PURSUANT TO 42 U.S.C. § 1983
(Against Defendants Board of Regents, Reed and Thurman in their official capacities for injunctive relief; and against Defendants Board of Regents, Reed and Thurman in their personal capacities for money damages)

278.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

279.    Defendant Reed stated that not responding to the investigation report against him meant that she would go by whatever was written against him within it; however, the handbook states that not responding will not be held against the respondent and taken as a general denial of the allegation.

## COUNT SEVEN
## BREACH OF CONTRACT
(Against Defendant Board of Regents)

280.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

281.    Defendants breached their contract with Mr. Whitaker by not following the guidelines outlined in their own policies and handbooks.  Such acts include: not providing Mr. Whitaker with a fair and impartial investigator and coordinator free from conflicts of interest; including a previous, and unrelated, allegation in the investigation in which Mr. Whitaker was never investigated for; refusing to charge Jane Roe with violating the no-contact order; failing to interview all of Mr. Whitaker's witnesses; failing to investigate Mr. Whitaker's counterclaim against Jane Roe or provide him with a hearing; not addressing the false statements given  during the hearing by Jane Roe, the investigator, and the Title IX coordinator; the professor not receiving a copy of the no-contact order; Defendant Reed failing to report Mr. Whitaker report of retaliation against her; Jane Roe not receiving a notice of the counterclaim investigation against her; Defendant Rush telling Mr. Whitaker that Jane Roe was out of the university's jurisdiction because she had graduated when the handbook says she is not; Defendant Rush not investigating Mr. Whitaker's counterclaim by stating they wanted to wait until after his investigation and hearing was over; Angelica Hardison telling Mr. Whitaker that they would not inform him if they did charge

Jane Roe for violating the no-contact order; and Defendant Rush attempting to have Mr. Whitaker's advisor violate the policy by speaking during meetings.

282.    As a result of the foregoing, Mr. Whitaker is entitled to damages in an amount to be determined at trial.

## COUNT EIGHT
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against Defendant Board of Regents)

283.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

284.    Defendants failed to deal with Mr. Whitaker in a fair and honest manner throughout the investigation by not providing him with impartial Title IX personnel free of conflicts of interest; backdating reports; including information that they told him they could not include; refusing to charge Jane Roe with violating the no-contact order; Defendant Rush telling Mr. Whitaker that Jane Roe was out of the university's jurisdiction because she had graduated when the handbook says she is not; Angelica Hardison telling Mr. Whitaker that they would not inform him if they did charge Jane Roe for violating the no-contact order; and refusing to investigate his counterclaim.

285.    As a result of the foregoing, Mr. Whitaker is entitled to damages in an amount to be determined at trial.

## COUNT NINE

## NEGLIGENCE
(Against Defendant Board of Regents)

286.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

287.    Defendants committed acts of negligence including not providing a rationale for why Mr. Whitaker was charged with sexual harassment; not charging Jane Roe with violating the no-contact order three times; not addressing the false statements given at the hearing my Jane Roe, the investigator, and the coordinator; Defendant Thurman omitting information that Mr. Whitaker gave her from her report; the bias investigator not removing Title IX personnel with conflicts of interest and having made biased statements by email; the bias investigator not including a rationale in her findings of no bias; not investigating Mr. Whitaker's counterclaim or providing him with a hearing; and the Board of Regents not addressing the issue of Jane Roe violating the no-contact order in their discretionary review.

## COUNT TEN
## NEGLIGENCE PER SE
(Against Defendant Board of Regents)

288.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

289.    Defendants neglected to ensure that Mr. Whitaker received a fair and impartial investigation apart from conflicts of interest.

**COUNT ELEVEN**
**FRAUD**
(Against Defendant Board of Regents)

290.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

291.   Defendants committed the act of fraud by backdating the investigation report sent on December 19th, 2016 to November 28th, 2016 which reflected a date before Mr. Whitaker sent his challenge for bias on December 10th, 2016. Defendant Reed attempted to deceive Mr. Whitaker on January 4, 2017 by stating that his challenge for bias came after her findings report despite knowing that it did not. The bias investigator, defendant Woods, used the backdated reports in deciding whether to find bias, or not, which she did not. Mr. Whitaker suffered by being misrepresented during the hearing by further false statements by the investigator and coordinator, only to be found innocent by the hearing panel. Further acts include: Defendant Byrdsong telling Mr. Whitaker that he would investigate his counterclaim and never doing so, Defendant Woods telling Mr. Whitaker that she would provide him with a rationale on her decision to not find bias and never doing so, and Defendant Rush making a decision on Mr. Whitaker's counterclaim without informing him that he would do so, while also serving as general counsel for Augusta University. Also, the investigator refused to charge Jane Roe with violating the no-contact order after she had spoken to Mr. Whitaker

after it had been issued by stating that it was okay for her to speak to him during class.

## COUNT TWELVE
### CONFLICT OF INTEREST
(Against Defendant Board of Regents)

292.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

293.   Mr. Whitaker identified six conflicts of interest throughout the investigation: the investigator serving as the Assistant Dean of Student Life & Enrollment, Student Counseling and Psychological Services Supervisor (of which Jane Roe received counseling from Augusta University), Office of Testing and Disability Services Supervisor, and Campus Assessment Response and Evaluation Team Chairperson; Defendant Reed worked under Defendant Rush who served as general counsel for Augusta University; Defendant Rush dismissed Mr. Whitaker's counterclaim while serving as a lawyer for Augusta University; Defendant Woods was selected by Augusta University officials from East Georgia State College as the bias investigator despite the partnership between the two colleges; Defendant Woods served as the Title IX coordinator from East Georgia State College, yet also had the role of Human Resources Director; and Defendant Byrdsong was selected by Defendant Rush to investigate Mr. Whitaker's counterclaim, yet held additional

duties in the Office of Diversion and Inclusion, not reporting directly to the Title IX coordinator.

## COUNT THIRTEEN
### NEGLIGENT HIRING, TRAINING, AND SUPERVISION
(Against Defendant Board of Regents)

294.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

295.    Defendant Board of Regents failed to hire, train, and supervise Title IX personnel to prevent conflicts of interest and bias.  The training material that was missing included due process rights of the accused and training on how to conduct a bias investigation.  No training records were retained by Augusta University for their Title IX staff; only for Defendant Woods at East Georgia State College.

## COUNT FOURTEEN
### BREACH OF CONTRACT/COMMON LAW: DENIAL OF BASIC FAIRNESS/ ARBITRARY AND CAPRICIOUS DECISION MAKING
(Against Defendant Board of Regents)

296.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

297.    The investigator did not include a rationale for charging Mr. Whitaker with sexual harassment, nor did the bias investigator include a rationale

for not finding bias in either the investigator or the Title IX coordinator. The investigator refused to charge Jane Roe with violating the no-contact order or held accountable for her false statements during the hearing (as well as the false statements of the investigator and Title IX coordinator). Defendant Rush dismissed Mr. Whitaker's counterclaim without a rationale and attempted to have Mr. Whitaker's advisor violate policy by speaking during meetings.

## COUNT FIFTEEN
## DELIBERATE INDIFFERENCE
(Against Defendant Board of Regents)

298.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

299.    Defendants showed deliberate indifference towards Mr. Whitaker's complaints by not charging Jane Roe with violating the no-contact order; the professor failing to change the lab groups after being instructed to by the Title IX coordinator; Mr. Whitaker's report of retaliation being ignored by the Title IX coordinator; Defendant Woods not removing Title IX personnel with conflicts of interest or providing a rationale for her decision; the false statements made by Jane Roe, the investigator, and the Title IX coordinator were not addressed and ignored by email; Angelica Hardison telling Mr. Whitaker that they would not inform him if they decided to charge Jane Roe with violating the no-contact order; and Defendant Rush dismissing Mr. Whitaker's counterclaim without a hearing, or an

investigation, and stating, "If you're gonna sue us, sue us," "I don't think your divorce has anything, necessarily, to do with this case," "Okay, get real. Really? Please, do me a favor, get real. Um, if you have fifty questions you wanna ask me, do me a favor--, and we're gonna end this meeting now because I get to do that," "It's the biggest issue for you, right now, in your life. It's not necessarily my biggest issue, right now," and telling him, "Whatever rights you have, please go forward. Godspeed. Do it."

## COUNT SIXTEEN
## HOSTILE ENVIRONMENT
(Against Defendant Board of Regents)

300.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

301.    Defendants created a hostile environment for Mr. Whitaker by allowing Jane Roe to speak to Mr. Whitaker three times after the no-contact order had been issued; the professor failing to change the lab groups; the investigator exposing Mr. Whitaker's emails for the professor to see; retaliation by the Title IX investigator and coordinator by ending his meeting when reporting the professor and ignoring his report of retaliation against the Title IX coordinator; the false statements made during the hearing by Jane Roe, the investigator and Title IX coordinator; and Defendant Rush refusing to investigate Jane Roe for violating the no-contact order and denying Mr. Whitaker a hearing.

## COUNT SEVENTEEN
## ERRONEOUS OUTCOME
### (Against Defendant Board of Regents)

302.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

303.   The outcome of the challenge for bias investigation was erroneous because the bias investigator failed to remove the Title IX coordinator and investigator for the conflicts of interest and biased statements; the bias investigator did not include a rationale for her decision-making or an analysis of the facts presented by Mr. Whitaker.

304.   The outcome of Jane Roe violating the no-contact order was not addressed in the Board of Regent's discretionary review after Mr. Whitaker appealed Augusta University's findings that it was not violated after Jane Roe admitted to speaking to Mr. Whitaker during the hearing and the professor admitted to witnessing her do so.

## COUNT EIGHTEEN
## PROMISSORY ESTOPPEL & RELIANCE
### (Against Defendant Board of Regents)

305.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

306.   The Board of Regents and Augusta University's various policies constitute representations and promises that the Board of Regents and Augusta

86

University should have reasonably expected to induce action, or forbearance, by

Mr. Whitaker.  Furthermore, Defendants made promises to Mr. Whitaker that were

breached to include:

> (i)   Defendants not following their own policies and guidelines in the
> sexual misconduct policy in regards to a fair and impartial investigation;
>
> (ii)  Defendant Reed telling Mr. Whitaker that she could recover their text
> message correspondence and later retracting that statement at the hearing;
>
> (iii) Defendant Thurman omitting information that Mr. Whitaker gave to her
> from her report, which she admitted to via email, yet told the hearing panel
> that she did not;
>
> (iv)  Defendant Woods, and Augusta University, promising Mr. Whitaker
> that they would provide him with a rationale and analysis of how Defendant
> Woods did not find bias in the investigator and coordinator and failing to do
> so;
>
> (v)   Defendant Byrdsong telling Mr. Whitaker that he was investigating his
> counterclaim and then abandoning the investigation without informing Mr.
> Whitaker;
>
> (vi)  Angelica Hardison telling Mr. Whitaker that he would not even know if
> they charged Jane Roe for violating the no-contact order; and
>
> (vii) Defendant Board of Regents failing to address the issue of Jane Roe
> violating the no-contact order in their discretionary review.

## COUNT NINETEEN
## SELECTIVE ENFORCEMENT
### (Against Defendant Board of Regents)

307.   Plaintiff repeats and realleges each and every allegation hereinabove

as if fully set forth herein.

308.   Defendants selectively enforced Title IX by:

(i)   Not charging Jane Roe with violating the no-contact order three times;

(ii)   The professor failing to change the lab groups after being instructed to do so by the Title IX coordinator;

(iii)   Defendant Thurman telling Mr. Whitaker that Jane Roe looking at him during class was not proof of harassment and then telling third parties that Jane Roe shared that Mr. Whitaker would look at her (stated in emails);

(iv)   Defendant Thurman omitted information that Mr. Whitaker gave to her from her report and admitted to doing so by email on January 17, 2017, yet informed the hearing panel that she did not;

(v)   False statements made by Jane Roe, the investigator, and the Title IX coordinator during the hearing were not addressed and emails were ignored;

(vi)   Defendant Reed ignored Mr. Whitaker's report against her for retaliation via email;

(vii)   Defendant Rush dismissed Mr. Whitaker's counterclaim without a hearing or an investigation and stated, "One answer.  Was that really harassment?"; and

(viii) Angelica Hardison telling Mr. Whitaker that he would not even know if they charged Jane Roe for violating the no-contact order.

(ix)   Defendant Thurman switched regarding the no-contact order after Jane Roe had violated it by stating that it was okay to speak during class when the no-contact order stated it was not.

**COUNT TWENTY**
**MALICIOUS PROSECUTION**
(Against Defendant Board of Regents)

88

309.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

310.    The charge against Mr. Whitaker was terminated in his favor due to no evidence on May 12, 2017 by the hearing panel that stated, "No other verifiable evidence was presented indicating sexual harassment had occurred." Defendant Thurman, Reed, and Rush played an active role in charging Mr. Whitaker and supported the charge with no evidence or rationale and changed why they charged him after Jane Roe could not produce any text messages alleging that he harassed her, despite still having her cell phone at the hearing. As gatekeeper against unmerited charges, Defendant Reed did not vet Defendant Thurman's charge and allowed it to move forward despite no rationale or evidence. Before Mr. Whitaker reported them for retaliation, Defendant Rush stated that there was no proof of harassment on December 6, 2016: "There's no proof that anything happened, unless we were there."

311.    As a result of the foregoing, Mr. Whitaker is entitled to damages, not limited to compensatory and punitive damages, in an amount to be determined at trial.

## COUNT TWENTY-ONE
## ABUSE OF DISCRETION
(Against Defendant Board of Regents)

312.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

313.   Defendants abused their discretion by:

(i)   Charging Mr. Whitaker with sexual harassment without a rationale.

(ii)   Defendant Thurman including a previous, and unrelated, allegation against Mr. Whitaker without his consent;

(iii)   Defendant Thurman altering her investigation report after Mr. Whitaker submitted a challenge for bias against her;

(iv)   Defendant Woods not removing the investigator or the Title IX coordinator from investigation and failing to state a rationale for her decision-making.

(v)   Defendant Rush dismissing Mr. Whitaker's counterclaim without an investigation, or a hearing, and not stating a rationale;

(vi)   Angelica Hardison telling Mr. Whitaker that he would not even know if they charged Jane Roe for violating the no-contact order; and

(vii)   Defendant Thurman omitted information that Mr. Whitaker gave to her from her report and admitted to doing so by email on January 17, 2017, yet informed the hearing panel that she did not.

(viii)   Defendant Thurman switched regarding the no-contact order after Jane Roe had violated it by stating that it was okay to speak during class when the no-contact order stated it was not.

## COUNT TWENTY-TWO
### ABUSE OF PROCESS
(Against Defendant Board of Regents)

314.   Plaintiff repeats and realleges each and every allegation hereinabove

as if fully set forth herein.

315.    Defendants attempted to coerce Mr. Whitaker into obtaining medical documentation to be removed from the biology course without penalty as a tradeoff for not reporting the professor for neglecting to change the lab groups. Mr. Whitaker refused and stated he would report them.  Soon after, Title IX personnel charged him with sexual harassment that was not supported by a rationale and was dismissed at the hearing.  Additional acts by Title IX personnel include:

(i)    Defendant Thurman ending Mr. Whitaker's meeting with him after he reported the professor failing to change the lab groups;

(ii)   Defendant Thurman exposing Mr. Whitaker's email for the professor to see without his consent;

(iii)  Defendant Thurman not interviewing all of Mr. Whitaker's witnesses;

(iv)   Defendant Thurman including a previous, and unrelated, allegation against Mr. Whitaker without his consent, as required in the handbook;

(v)    The professor ignoring Jane Roe's violation of the no-contact order during class;

(vi)   Defendant Reed's cell phone going missing after telling Mr. Whitaker that she could recover their text message correspondence concerning the lab groups and then stating during the hearing that she could not do so;

(vii)  Defendant Reed ignoring Mr. Whitaker's report of retaliation against her;

(viii)  Defendant Reed telling Mr. Whitaker that not responding to the investigation report meant that she would go by what was written in the report against him, despite the handbook reading otherwise;

(ix)   The bias investigator, Defendant Woods, not finding bias with the investigator or the Title IX coordinator without a rationale or analysis of the facts and refusing to recuse herself due to the partnership between Augusta University and East Georgia State College, which presented a conflict of interest;

(x)   The false statements by Jane Roe, the investigator, and the Title IX coordinator, being unaddressed by the hearing panel and ignored via emails from Mr. Whitaker;

(xi)   Defendant Rush dismissing Mr. Whitaker's counterclaim without a rationale, investigator, or a hearing;

(xii)  Defendant Rush attempting to have Mr. Whitaker's advisor violate the policy by speaking during meetings.

(xiii) Angelica Hardison telling Mr. Whitaker that he would not even know if they charged Jane Roe for violating the no-contact order.

**COUNT TWENTY-THREE**
**DEFAMATION PER SE**
(Against Defendant Board of Regents)

316.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

317.    After the hearing, Defendant Rush stated that the professor told him that she had concerns that Mr. Whitaker was 'riding by her house.'  Mr. Whitaker's advisor, Deborah Collier, and Defendant Rush's employee, Angelica Hardison, were present at the meeting on September 5, 2017, when the allegation was made.

The professor, Defendant Wear, never stated that she felt any apprehension towards Mr. Whitaker during the hearing, in which he called and questioned her as a witness.

**COUNT TWENTY-FOUR**
**TORTIOUS INTERFERENCE WITH CONTRACT**
(Against Defendant Board of Regents)

318.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

319.    Defendants denied Mr. Whitaker the benefits and protections offered in their grievance policies by:

(i)   Defendant Rush dismissing Mr. Whitaker's counterclaim without an investigation, or a hearing, and telling him, "If you're gonna sue us, sue us," "I don't think your divorce has anything, necessarily, to do with this case," "Okay, get real. Really? Please, do me a favor, get real. Um, if you have fifty questions you wanna ask me, do me a favor--, and we're gonna end this meeting now because I get to do that," "It's the biggest issue for you, right now, in your life. It's not necessarily my biggest issue, right now," and telling him, "Whatever rights you have, please go forward. Godspeed. Do it.";

(ii)   Defendant Reed ignoring Mr. Whitaker's report of retaliation against her;

(iii)   Defendant Reed telling Mr. Whitaker that she could recover their text message correspondence and then telling him that her cell phone was missing and that she could not recover the text messages at the hearing; and

93

(iv)  False statements made by Jane Roe, the investigator, and the Title IX coordinator, were unaddressed by the hearing panel and the emails that Mr. Whitaker sent were ignored; and

(v)  Defendant Thurman omitted information that Mr. Whitaker gave to her from her report and admitted to doing so by email on January 17, 2017, yet informed the hearing panel that she did not.

## COUNT TWENTY-FIVE
## INVASION OF PRIVACY (VIOLATION OF CONFIDENTIALITY AND FALSE LIGHT)
(Against Defendant Board of Regents)

320.  Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

321.  Defendants violated Mr. Whitaker's privacy and confidentiality by:

(i)  Defendant Thurman exposed Mr. Whitaker's emails for the professor to read while he was enrolled in the course and the investigation was open;

(ii)  Defendant Thurman included a previous, and unrelated, allegation against Mr. Whitaker in which he was never charged or investigated for;

(iii)  Defendant Thurman told third parties that Jane Roe shared that Mr. Whitaker would look at her during class, yet told Mr. Whitaker that reporting the the professor looked at him differently was not evidence;

(iv)  Defendant Thurman included Mr. Whitaker's home address and phone number on the first page of the investigation report and removed from the second one after it had already been released to Jane Roe;

(v)  Defendant Thurman stated that Mr. Whitaker admitted to giving Jane Roe a massage during the hearing with no evidence; and

(vi)   Defendant Thurman omitted information that Mr. Whitaker gave to her from her report and admitted to doing so by email on January 17, 2017, yet informed the hearing panel that she did not.

**COUNT TWENTY-SIX**
**HARASSMENT**
(Against Defendant Board of Regents)

322.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

323.   Defendant's allowed Jane Roe to violate the no-contact order three times and did not charge her for doing so, stating that if they did charge her, Mr. Whitaker would not be made aware and that she was out of the university's jurisdiction because she had graduated.  After the violations were committed and the professor failed to change the lab groups, Mr. Whitaker dropped out of the course due to anxiety.

**COUNT TWENTY-SEVEN**
**COERCION**
(Against Defendant Board of Regents)

324.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

325.   Defendant Thurman, Defendant Reed, and Defendant Rush coerced Mr. Whitaker to obtain medical documentation to give to the investigator in order to be removed from the biology course as a tradeoff for not reporting that the professor failed to change the lab groups and failing to respond to Jane Roe

continuing to speak to him after the no-contact order had been issued. When Mr. Whitaker refused and stated that he would report them for bias, he was charged with sexual harassment with no rationale in an investigation report that was backdated to a date before his report of bias. The charge was later dismissed by a hearing panel.

## COUNT TWENTY-EIGHT
## TAMPERING WITH RECORDS
(Against Defendant Board of Regents)

326.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

327.   Defendant Thurman altered her investigation report after Mr. Whitaker submitted a challenge for bias against her by backdating the report to reflect a date before his challenge for bias was sent. Defendant Reed attempted to use the backdated report against Mr. Whitaker and told him that his challenge for bias was too late because it came after her report was sent out. Mr. Whitaker sent his challenge for bias on December 9, 2016, yet Defendant Thurman's report was sent on December 19, 2016 and backdated to reflect November 28, 2016. Furthermore, Defendant Thurman altered the content of her second report without Mr. Whitaker's consent, or foreknowledge, after the challenge for bias had been initiated so that the bias investigator, Defendant Woods, would rely on the updated report and not the original one that Mr. Whitaker reported instances of bias for.

## COUNT TWENTY-NINE
## FALSIFYING DOCUMENTS
(Against Defendant Board of Regents)

328.　Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

329.　Defendant Thurman included information in her investigation report regarding the professor changing the lab groups that she told Mr. Whitaker she could not in the investigation, backdated the report, and stated that Jane Roe requested for the lab groups to be changed, when Mr. Whitaker made the request on the day of finding out about the allegation against him.　Email correspondence and the professor collaborated Mr. Whitaker's request on the day of the hearing.

## COUNT THIRTY
## MISREPRESENTATION AND NONDISCLOSURE
(Against Defendant Board of Regents)

330.　Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

331.　Defendants Board of Regents did not disclose information during the investigation that affected the outcome of the process in that:

(i)　Augusta University officials did not disclose the partnership between Augusta University and East Georgia State College before selecting Defendant Woods to investigate Mr. Whitaker's claims of bias from the investigator and Title IX coordinator; of which Defendant Woods from East Georgia State College did not find bias or include a rationale for her

decision-making.  The partnership was renewed on September 20, 2017 for five years and Defendant Woods made her decision on March 23, 2017;

(ii)   Defendant Woods, and Augusta University officials, telling Mr. Whitaker that they would provide him with information on how Defendant Woods reached her decision and never doing so;

(iii)   Defendant Thurman including information about the lab groups in her report after informing Mr. Whitaker that she was not going to do so via email (that it was outside the scope of the investigation);

(iv)   Defendant Byrdsong stating that he was assigned to investigate Mr. Whitaker's counterclaim without informing him that he was not a full-time investigator working apart from the Title IX coordinator and then leaving the university without informing Mr. Whitaker that he had abandoned him counterclaim;

(v)   Defendant Rush stating that he was a Title IX coordinator when he serves as general counsel as a lawyer for Augusta University and Defendant Reed is the only recognized Title IX coordinator at the university;

(vi)   Defendant Thurman and Defendant Reed misrepresented Mr. Whitaker during the hearing by giving false statements to the hearing panel that he did not know were going to be said against him; and

(vii)   Defendant Thurman omitted information that Mr. Whitaker gave to her from her report and admitted to doing so by email on January 17, 2017, yet informed the hearing panel that she did not.

(viii) Defendant Thurman switched regarding the no-contact order after Jane Roe had violated it by stating that it was okay to speak during class when the no-contact order stated it was not.

## COUNT THIRTY-ONE

## CONSPIRACY AGAINST RIGHTS IN VIOLATION OF 42 U.S.C. § 1985
(Against Defendant Board of Regents)

332.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

333.    Defendants conspired against Mr. Whitaker's educational rights by:

(i)   Defendant Thurman, Defendant Reed, and Defendant Rush attempted to have Mr. Whitaker obtain medical documentation to give the investigator, Defendant Thurman, as a tradeoff for not reporting the professor for failing to change the lab groups and stop Jane Roe from speaking to him during class after the no-contact order have been issued.  After the meeting, Mr. Whitaker wrote that he would be reporting them and they soon after charged him with sexual harassment without a rationale which was thrown out by a university hearing panel.

(ii)   Defendant Woods was selected from East Georgia State College and did not disclose to Mr. Whitaker that they had a partnership with Augusta University.  Defendant Woods did not find bias with the investigator, or the Title IX coordinator, and never wrote back to Mr. Whitaker how she reached her decision after promising to do so, along with Augusta University officials assuring him that she would.

(iii)   Defendant Rush and his employee, Angelica Hardison, denied Mr. Whitaker an investigation and a hearing by dismissing his counterclaim against Jane Roe for violating the no-contact order without stating why. Defendant Rush stated that Jane Roe was out of the university's jurisdiction because she had graduated, but the policy stated that she was not.  Angelica Hardison told Mr. Whitaker that if they did charge Jane Roe for violating the no-contact order, they would not inform him.

## COUNT THIRTY-TWO
## DECEPTIVE TRADE PRACTICES
(Against Defendant Board of Regents)

334.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

335.   Defendants committed the act of deceptive trade practices by:

(i)     Defendant Thurman backdating her investigation report;

(ii)    Defendant Thurman refusing to charge Jane Roe with violating the no-contact order, yet the directive stated that no contact was allowed even during class;

(iii)   Defendants not giving Mr. Whitaker a fair and impartial investigation by assigning personnel with conflicts of interest;

(iv)    Defendant Thurman omitted information that Mr. Whitaker presented;

(v)     Jane Roe, Defendant Thurman, and Defendant Reed gave false statements at the hearing that were not addressed;

(vi)    Defendant Thurman did not interview all of Mr. Whitaker's witnesses;

(vii)   Augusta University assigned Defendant Woods from East Georgia State College to investigate Mr. Whitaker's challenge for bias despite the partnership between the two universities;

(viii)  Defendant Byrdsong not being a full-time Title IX investigator and abandoning Mr. Whitaker's counterclaim by leaving the university while under investigation;

(ix)    Defendant Rush told Mr. Whitaker that he was a Title IX coordinator when he was not;

(x)     Defendant Rush stating that the professor was concerned that Mr. Whitaker was driving by her house without any evidence;

(xi)   Defendant Rush stating that Mr. Whitaker's counterclaim was not investigated because they wanted to wait until Jane Roe's was finished;

(xii)   Defendant Rush telling Mr. Whitaker that Jane Roe was out of the university's jurisdiction because she had graduated, yet the handbook stated that she was not; and

(xiii)   Angelica Hardison telling Mr. Whitaker that he would not be informed if they did decide to charge Jane Roe with violating the no-contact order.

## COUNT THIRTY-THREE
### VIOLATION OF THE GEORGIA ADMINISTRATIVE PROCEDURE ACT
#### (Against Defendant Board of Regents)

336.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

337.   Defendants violated the Georgia Administrative Procedure Act by:

(i)   Assigning Title IX personnel with conflicts of interest to Mr. Whitaker's investigation;

(ii)   Defendant Woods not providing a rationale for her decision-making; and

(iii)   Augusta University officials refusing to investigate Mr. Whitaker's counterclaim against Jane Roe and provide him with a hearing.

## COUNT THIRTY-FOUR
### VIOLATION OF THE GEORGIA OPEN RECORDS ACT
#### (Against Defendant Board of Regents)

338.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

339.    Augusta University did not provide Mr. Whitaker with the training records and certifications of their Title IX personnel upon request; their response was that they did not keep those types of records on file.  However, East Georgia State University was able to provide the training records and certifications for Defendant Woods for 2016 and 2017.

## COUNT THIRTY-FIVE
## VIOLATION OF DUE PROCESS, EQUAL PROTECTION, AND PRIVACY UNDER THE GEORGIA CONSTITUTION
(Against Defendant Board of Regents)

340.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

341.    Defendants did not provide Mr. Whitaker with procedural and substantive due process by dismissing his counterclaim, omitting information for their reports, not interviewing all of his witnesses, and assigning Title IX personnel with conflicts of interest.  Mr. Whitaker was denied equal protection because Jane Roe was allowed to violate the no-contact order and not receive discipline for it. Mr. Whitaker's privacy rights were violated because the investigator exposed his emails for the professor to see and included his address and phone number on the first page of her investigation report that was sent to Jane Roe after she threatened that her boyfriend would come to talk to him in a written statement.

## COUNT THIRTY-SIX

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
(Against Defendant Board of Regents)

342.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

343.   Defendants neglected to ensure that Mr. Whitaker received a fair and impartial investigation free from conflicts of interest and to prevent Jane Roe from violating the no-contact order.  Due to the university's negligence, Mr. Whitaker failed his biology course and withdrew from the university to seek counseling.

## COUNT THIRTY-SEVEN
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(Against Defendant Board of Regents)

344.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

345.   Defendants refused to charge Jane Roe with violating the no-contact order, gave false statements during the hearing, and made statements to Mr. Whitaker after the hearing such as, "If you're gonna sue us, sue us," "I don't think your divorce has anything, necessarily, to do with this case," "Okay, get real. Really? Please, do me a favor, get real. Um, if you have fifty questions you wanna ask me, do me a favor--, and we're gonna end this meeting now because I get to do that," "It's the biggest issue for you, right now, in your life. It's not necessarily my biggest issue, right now," and telling him, "Whatever rights you have, please go

forward. Godspeed. Do it." Mr. Whitaker withdrew from the university and sought counseling regarding his experience throughout the investigation.

## VI. **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)     on the first cause of action for discrimination on the basis of gender in violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(ii)     on the second cause of action for discrimination on the basis of race and color in violation of Title VI of the Civil Rights Act of 1964, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(iii)     on the third cause of action for violation of procedural and substantive due process of the Fifth and Fourteenth amendment to the United States Constitution, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(iv)     on the fourth cause of action for violation of the equal protection clause of the Fourteenth amendment of the United States Constitution, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(v)    on the fifth cause of action for retaliation in violation of the First Amendment of the United States Constitution, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(vi)    on the sixth cause of action for violation of the right against self-incrimination clause of the Fifth amendment to the United States Constitution, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(vii)    on the seventh cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(viii)    on the eighth cause of action for breach of covenant of good faith and fair dealing, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(ix)    on the ninth cause of action for negligence, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(x)    on the tenth cause of action for negligence per se, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xi)    on the eleventh cause of action for fraud, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xii)    on the twelfth cause of action for conflict of interest, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xiii)    on the thirteenth cause of action for negligent hiring, training, and supervision, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xiv)    on the fourteenth cause of action for breach of contract/common law: denial of basic fairness/arbitrary and capricious decision making, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xv)    on the fifteenth cause of action for deliberate indifference, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xvi)    on the sixteenth cause of action for hostile environment, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xvii)    on the seventeenth cause of action for erroneous outcome, a judgment awarding Plaintiff damages in an amount to be determined at trial,

including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xviii)    on the eighteenth cause of action for promissory estoppel and reliance, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xix)    on the nineteenth cause of action for selective enforcement, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xx)    on the twentieth cause of action for malicious prosecution, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xxi)    on the twenty-first cause of action for abuse of discretion, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xxii)    on the twenty-second cause of action for abuse of process, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xxiii)    on the twenty-third cause of action for defamation per se, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xxiv)   on the twenty-fourth cause of action for tortious interference with contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xxv)   on the twenty-fifth cause of action for invasion of privacy (violation of confidentiality and false light), a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xxvi)   on the twenty-sixth cause of action for harassment, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xxvii)   on the twenty-seventh cause of action for coercion, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xxviii)   on the twenty-eighth cause of action for tampering with records, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xxix)   on the twenty-ninth cause of action for falsifying documents, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xxx)   on the thirtieth cause of action for misrepresentation and nondisclosure, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing,

emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xxxi)   on the thirty-first cause of action for conspiracy against rights, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xxxii)   on the thirty-second cause of action for deceptive trade practices, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xxxiii)   on the thirty-third cause of action for violation of the Georgia Administrative Procedure Act, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xxxiv)   on the thirty-fourth cause of action for violation of the Georgia Open Records Act, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xxxv)   on the thirty-fifth cause of action for violation of due process, equal protection, and privacy under the Georgia Constitution, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xxxvi)   on the thirty-sixth cause of action for negligent infliction of emotional distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing,

emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xxxvii)   on the thirty-seventh cause of action for intentional infliction of emotional distress a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(xxxviii)   awarding Plaintiff a refund of his tuition and fees in the amount of $3,378.67 that he paid and had to repay the portions contributed by the Veteran Affairs (Post-9/11 GI Bill (Chapter 33)) and U.S. Army (tuition assistance);

(xxxix)   awarding Plaintiff declaratory relief by (1) entering a finding that Defendant's sexual misconduct policy be found unconstitutional on the grounds of incomplete guidance regarding the due process rights of the accused and (2) entering a finding that Defendant violated Plaintiff's right to privacy and access to hearing records under the Family Educational Rights and Privacy Act ("FERPA") (20 U.S.C. § 1232g; 34 CFR Part 99).

(xl)   awarding Plaintiff injunctive relief by (1) removing the failing grade received in his macroeconomics course from his academic transcript; (2) ordering Defendant Board of Regents to revise its sexual misconduct policy to include the challenge for bias investigator including a written rationale behind their decision-making and documentation of all interviews conducted; (3) ordering Defendant Board of Regents to revise its sexual misconduct policy to state that investigator's include a written rationale in their decision-making; (4) ordering Defendant Board of Regents to revise its sexual misconduct policy to preclude removing students from academic activities and classes or placing holds on their accounts until they respond to an allegation made against them; (5) ordering Defendant Board of Regents to terminate the partnership established in 2013 between Augusta University and East Georgia State College on the grounds of conflict of interest due to the involvement of Defendant Woods in the bias investigation; (6) ordering Defendant Board of Regents to require all Title IX coordinators and investigators to function separately and independently from the influence of all other departments at their institutions; (7) ordering Defendant Board of Regents to require readily-assessable documentation of all annual training of Title IX staff; and (8) ordering Board of Regents to revise its sexual misconduct policy to include

any persons adjudicating an investigation disclose any conflicts of interest at the beginning of any investigation by informing all parties of any, and all, additional job duties that may pose an actual, or potential, conflict of interest.

     (xli)  awarding Plaintiff Court costs and filing fees;

     (xlii)  awarding Plaintiff compensatory and punitive damages for the conduct described herein; and

     (xliii)  awarding Plaintiff such other and further relief as the Court deems just, equitable, and proper.

## VII. CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I, DeMarcus Whitaker, certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

A. I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

## <u>JURY DEMAND</u>

Plaintiff herein demands a trial by jury of all issues so triable in the present matter.

**Dated:  August 31, 2018**

**Respectfully submitted,**

111

DeMarcus A. Whitaker
1008 Fox Den Rd
Hephzibah, GA 30815
Telephone: (706) 877 – 0482
dwhitaker279@gmail.com
Plaintiff, Pro Se